## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EHLENA FRY, a minor, by her next friends,
STACY FRY and BRENT FRY,

       Plaintiff,

v.

NAPOLEON COMMUNITY SCHOOLS,
JACKSON COUNTY INTERMEDIATE
SCHOOL DISTRICT, and PAMELA
BARNES, in her individual capacity,

       Defendants.

Case No. _____

COMPLAINT AND JURY DEMAND

---

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.    This disability rights case is filed by a young girl with cerebral palsy against her former school district and intermediate school district for refusing to allow her to bring a trained service dog with her to school to assist her with mobility and balance problems and increase her independence.

2.    Plaintiff Ehlena Fry is an eight-year-old girl who was born with spastic quadriplegic cerebral palsy, the most severe form of cerebral palsy. Spastic quadriplegic cerebral palsy affects Ehlena's legs, arms, and body and significantly limits her motor skills and mobility. She is not impaired cognitively, but needs physical assistance in her daily activities.

3.    In 2009, when Ehlena was five years old, Ehlena's parents, with the generous help of families at Ehlena's elementary school and throughout the community, obtained a service dog prescribed by their pediatrician to help her to live as independently as possible. Together the family and the dog, a Goldendoodle named "Wonder," trained at a facility in Ohio for service

animals and their handlers. Wonder was certified and trained to help Ehlena with mobility and to assist her in daily activities, including retrieving dropped items, opening and closing doors, turning on and off lights, taking her coat off, using the bathroom, and helping bridge social barriers.

4.     It was the pediatrician's and the family's intention for Wonder to accompany Ehlena at all times to facilitate her independence and to ensure that Ehlena and Wonder would bond after the training. However, despite knowing of the Frys' plans, Defendants refused to allow Ehlena to attend school with Wonder.

5.     As a result, Ehlena was forced to attend school without Wonder from October 2009 to April 2010. After Ehlena's lawyers met with the school district's counsel, Ehlena was allowed to bring Wonder to school for a "trial period" at the end of the school year. However, the administration refused to allow Ehlena to use Wonder as a service dog during that period; rather, the dog was required to remain in the back of the room during classes, was forbidden from assisting Ehlena with many tasks he had been specifically trained to do, and was forbidden from accompanying and assisting Ehlena during recess, lunch, computer lab, library time and other activities.

6.     Following the trial period, the administration refused to modify the school's policies to accommodate Ehlena's disabilities as required by law and even refused to recognize Wonder as a service dog. Consequently, Ehlena's parents removed her from school and filed a complaint with the Office of Civil Rights (OCR) at the United States Department of Education. While waiting for an OCR ruling, Ehlena was homeschooled using an online curriculum and she had very limited contact with children her own age.

2

7.     Two years later, in May 2012, OCR issued a disposition letter finding that Ehlena's school district, Defendant Napoleon Community Schools, and Defendant Jackson Intermediate School District had violated Ehlena's rights under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act and the regulations implementing these civil right laws.

8.     In order to settle the complaint with OCR, the school district agreed to take Ehlena back with Wonder, but the district refused to accept the factual findings or legal conclusions of OCR. After Ehlena's father, Brent Fry, spoke with Pamela Barnes, the principal, to discuss Ehlena returning to school with Wonder, the parents had serious concerns that the administration would resent Ehlena and make her return to school difficult. Accordingly, they found a public school in Washtenaw County where the staff welcomed Ehlena and Wonder and saw their presence as an opportunity to promote inclusion of students with disabilities within the school. Ehlena now attends the school in Washtenaw County.

9.     Ehlena, through her parents, brings this action against the Napoleon Community Schools and Jackson Intermediate School District, and Pamela Barnes, pursuant to the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Michigan Persons with Disabilities Civil Rights Act. She seeks a declaration that her rights were violated and damages for the injuries she suffered as a result of the denial of her civil rights.

## JURIDICTION AND VENUE

10.    Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343 because this is a civil action seeking redress for the deprivation of rights secured by federal law -- specifically Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.*, Section 504 of the

Rehabilitation Act of 1973, 42 U.S.C. § 794(a), and 42 U.S.C. § 1983.  Jurisdiction over the supplemental state-law claim is proper under 28 U.S.C. § 1367.

11.     Venue is proper in that the complained of actions took place in, and the parties reside in, Jackson County, which is in the Eastern District of Michigan.

## PARTIES

12.     Plaintiff Ehlena Fry is a minor who resides in Jackson County, within the Eastern District of Michigan.  She brings this action through her parents and next friends, Stacy and Brent Fry, who also reside in Jackson County.

13.     Defendant Napoleon Community Schools (the "District") is a public school district and a body corporate organized under the laws of Michigan, located in Jackson County.

14.     Defendant Jackson County Intermediate School District ("ISD") is a public intermediate school district organized under the laws of Michigan, located in Jackson County.

15.     Pamela Barnes is the principal of Ezra Eby Elementary School.

16.     During the 2009-2010 school year, Plaintiff attended Ezra Eby Elementary School, which is part of the Defendant Napoleon Community Schools and Defendant Jackson Intermediate School District.

## FACTUAL ALLEGATIONS

17.     Plaintiff incorporates the preceding paragraphs.

18.     Ehlena was born in 2004 and is now eight years old.

19.     Ehlena was born with spastic quadriplegic cerebral palsy, which is the most severe form of cerebral palsy.  Spastic quadriplegic cerebral palsy affects Ehlena's legs, arms, and body and significantly limits her motor skills and mobility.

20.     Ehlena is not cognitively impaired, but she also has been diagnosed with ADHD inattentive type and seizure disorder.

21.     Ehlena is a person with a disability as that term is defined by Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, and the Michigan Persons with Disabilities Civil Rights Act.

22.     On or about May 2008, Ehlena's pediatrician wrote a prescription for a service dog to assist her in her everyday activities.

23.     Before enrolling her in the Ezra Eby Elementary School kindergarten program for the 2009-2010 school year, Ehlena's parents informed the school administration that they planned to obtain a service dog for Ehlena to assist her in her everyday activities. Defendants led Ehlena's parents to believe that the service dog could attend school with Ehlena.

24.     During the 2008-2009 school year, the surrounding communities sponsored a successful fundraisers to raise a portion of the approximately $13,000 to help Ehlena's family pay for the training of a service dog, "Wonder."

25.     Wonder is a Goldendoodle, a cross between a Golden Retriever and a Poodle. Goldendoodles are known for being intelligent, affectionate, human-oriented dogs. Because Goldendoodles have a no-shedding or low-shedding coat, they are generally tolerable to people with allergies to dogs.

26.     In the fall of 2009, Ehlena and her family trained with Wonder at the service animal training facility "4 Paws for Ability" in Ohio, a non-profit agency specializing in placing service dogs.

27.     Wonder is a specially trained and certified service dog and assists Ehlena in a number of ways, including, but not limited to, retrieving dropped items, helping her balance

5

when she uses her walker, opening and closing doors, turning on and off lights, helping her take off her coat, helping her transfer to and from the toilet.

28.     Wonder enables Ehlena to develop independence and confidence and helps her to bridge social barriers.

29.     While Ehlena must have a handler assist her with Wonder while she is young, she will be able to handle Wonder on her own when she is older and stronger.

30.     In October 2009, Wonder received his certification and returned to Michigan with Ehlena and her family.

31.     However, much to the Frys' surprise and disappointment, Defendants told them that Ehlena could not bring Wonder to school.

32.     Jackson County Intermediate School District Director Richard Rendell and Pamela Barnes formalized the decision to reject the request to bring Wonder to school in a specially convened Individualized Education Plan ("IEP") meeting on January 7, 2010.

33.     The IEP states that Ehlena's parents "requested a service dog for their daughter to enhance her independence" and that the request was denied as Ehlena's "physical and academic needs are being met through the services/programs/accommodations of the IEP."

34.     The Frys, through pro bono counsel, negotiated an agreement with Defendants under which Ehlena was allowed to bring Wonder to school for a 30-day "trial period" that began on April 12, 2010 and was extended through the end of the school year.

35.     However, Defendants refused to allow Ehlena to use Wonder as a service dog during the trial period; rather, the dog was required to remain in the back of the room during classes, and was forbidden from assisting Ehlena with many tasks he had been specifically trained to do.

6

36. Defendants also refused to allow Wonder to accompany and assist Ehlena during recess, lunch, computer lab and library.

37. Defendants further prohibited Ehlena from participating in other activities with Wonder such as walking the track during "Relay for Life," a school play and "field day."

38. Following the trial period, Defendants refused to modify the school's policies to accommodate Ehlena's disabilities for the next school year as required by law.

39. Defendants refused to extend the areas where Wonder would be allowed to assist Ehlena and refused to allow Wonder to perform all the tasks for which he had been trained.

40. Defendants even refused to recognize Wonder as a service dog.

41. As a result, Ehlena's parents removed Ehlena from Ezra Eby Elementary School and filed a complaint with the Office of Civil Rights (OCR) at the United States Department of Education.

42. While waiting for an OCR ruling, Ehlena was homeschooled using an online curriculum for two years.

43. In addition to her duties raising Ehlena and her siblings, Stacy Fry took on the added educational responsibilities to ensure that Ehlena was receiving the appropriate curriculum.

44. Stacy Fry's role as Ehlena's teach was particularly challenging and frustrating because she did not have specific training in teaching methods that Ehlena required.

45. Ehlena had very limited contact with children her own age while she was being homeschooled.

46. Two years later, in May 2012, OCR issued a 14-page disposition letter to the school finding that Ehlena's school district and intermediate school district had violated Ehlena's

rights under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act and the federal regulations implementing the laws. (See 5/3/12 Disposition Letter and Resolution Agreement, attached as Exhibit A)

47.     In order to settle the complaint with OCR, the school district entered into a six-page resolution agreement in which it agreed to take Ehlena back with Wonder and allow Wonder to accompany and assist Ehlena throughout the school. However, the district refused to accept the factual findings or legal conclusions of OCR. (*See* Exhibit A)

48.     After Brent Fry spoke with the Pamela Barnes in the summer of 2012 to discuss Ehlena returning to school with Wonder in the fall, Ehlena's parents had serious concerns that the administration would resent Ehlena and make her return to school difficult.

49.     Accordingly, they found a public school in Washtenaw County, where the principal and staff enthusiastically welcomed Ehlena and Wonder and saw their presence as an opportunity to promote inclusion of students with disabilities within the school.

50.     Ehlena now attends a Washtenaw County school and is again able to interact with children her own age.

51.     Defendants' refusal to accommodate Ehlena's disabilities has caused her harm, including, but not limited to:

a.     denial of equal access to Defendants' facilities, programs, and services;

b.     denial of the use of Wonder as a service dog at school from October 2009 to June 2010;

c.     interference with Ehlena's ability to form a bond with Wonder from October 2009 to June 2010, which compromised Wonder's ability to effectively assist Ehlena outside of school;

8

d.      denial of the opportunity to interact with other students at Ezra Eby Elementary

School during the 2010-2011 and 2011-2012 school years when she was  homeschooled

due to the refusal of Defendants to use Wonder as a service dog at school;

e.      loss of ability to interact with students at Ezra Eby Elementary School and stress

caused by leaving the Napoleon Community Schools and enrolling in a new school in a

different county for the 2012-2013 academic year; and

f.      emotional distress and pain, embarrassment, mental anguish, inconvenience, and

loss of enjoyment of life resulting from Defendants' refusal to reasonably accommodate

her as a person with a disability who uses a service animal.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF AGAINST THE NAPOLEON COMMUNITY SCHOOLS AND JACKSON COUNTY INTERMEDIATE SCHOOL DISTRICT SECTION 504 OF THE REHABILITATION ACT OF 1973

52.     Plaintiff incorporates the preceding paragraphs.

53.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its

implementing regulations provide, "no otherwise qualified individual with a disability in the

United States . . . shall, solely by reason of her or his disability, be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4(a).

54.     Among other requirements, entities subject to Section 504 must provide equal

opportunity to qualified persons with disabilities to participate or benefit from any aid, benefit, or

service they make available. 34 C.F.R. § 104.4(b)(1)(ii).

55.     Entities subject to Section 504 must avoid otherwise limiting a qualified

individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity

enjoyed by others receiving an aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

56.    An "individual with a disability" is defined by reference to the Americans with Disabilities Act ("ADA"). 29 U.S.C. § 705(20)(B); referencing 42 U.S.C. § 12102(1). A person has a disability under Section 504 if they have a physical or mental impairment that substantially limits one or more of their major life activities. 42 U.S.C. § 12102(1).

57.    Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, and working. 42 U.S.C. § 12102(2)(A). Major life activities also include the operations of major bodily function. 42 U.S.C. § 12102(2)(B).

58.    A "qualified individual with a disability" is one who, with or without reasonable accommodations for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of Federal financial assistance. *See* 29 U.S.C. § 794(a).

59.    A "program or activity" includes local education agencies, public boards of education, and school systems. 29 U.S.C. § 794(b)(2)(B), referencing 20 U.S.C. § 7801(26). A "recipient of federal financial assistance" is a public or private agency or other entity to which Federal financial assistance is extended directly or through another recipient. 34 C.F.R. § 104.3(f).

60.    Ehlena is an individual having physical impairments, including but not limited to, spastic quadriplegic cerebral palsy, and although Ehlena is not cognitively impaired, she also has been diagnosed with ADHD inattentive type and seizure disorder.

61.    Ehlena's impairments affect her major life activities of caring for herself, and performing manual tasks. *See* 42 U.S.C. § 12102(2).

62.    Ehlena is an individual with disabilities as defined by Section 504.  29 U.S.C. §
705(20)(B); referencing 42 U.S.C. § 12102(1).

63.    Ehlena is an otherwise qualified individual with disabilities who meets essential
eligibility requirements to receive services from or participate in the programs or activities of the
District and ISD.  *See* 42 U.S.C. § 12131(2); 29 U.S.C. § 794(a).

64.    Ehlena attended and received educational services from the District and ISD.

65.    The District and ISD are a "program[s] or activit[ies]" subject to Section 504.  *See*
29 U.S.C. § 794(b)(2)(B), referencing 20 U.S.C. § 7801(26).

66.    The District and ISD are recipients of federal financial assistance as they receive
federal funds.

67.    The District and ISD are entities subject to the non-discrimination requirements of
Section 504.  *See* 29 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4.

68.    The District's and ISD's refusal to allow Wonder to act as a service dog for
Ehlena and to permit his access in the instructional setting discriminated against Ehlena as a
person with disabilities who uses a service animal by denying her equal access and otherwise
limiting her access to the District's and ISD's facilities, programs, and services as compared to
her non-disabled, non-service animal user peers.  *See* 34 C.F.R. §§ 104.4(a), 104.4(b)(ii) and
(iv).

69.    The District's and ISD's refusal to recognize Wonder as a service dog and to
permit his access in the instructional setting was illegal disability-based discrimination that
violated Section 504 of the Rehabilitation Act of 1973.

70.    The District's and ISD's discrimination was intentional as the District's and ISD's
knowingly refused to recognize Wonder as a service dog despite having full knowledge that

Ehlena qualified as an individual with disabilities and relied upon Wonder to obtain equal access to the District's and ISD's facilities, programs, and services as compared to her non-disabled, non-service animal user peers.

71.     As a proximate cause of these violations of Section 504, Ehlena has suffered harm as set forth above.

## SECOND CLAIM FOR RELIEF AGAINST THE NAPOLEON COMMUNITY SCHOOLS AND JACKSON COUNTY INTERMEDIATE SCHOOL DISTRICT TITLE II OF THE AMERICANS WITH DISABILITIES ACT

72.     Plaintiff incorporates all prior allegations.

73.     Title II of the ADA and its implementing regulations forbid public entities, including local educational agencies, to exclude or deny people with disabilities the benefits of its services, programs, or activities, or to discriminate based on disability. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.104 & .130(a).

74.     Prohibited disability-based discrimination by public entities includes the failure to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from aids, benefits, or services or "otherwise limit" a qualified individual with a disability in the enjoyment of any right, privilege, aid, benefit, or service.  28 C.F.R. § 35.130(b)(1)(ii) & (vii). Prohibited discrimination additionally includes the failure to make reasonable modifications as necessary to avoid discrimination against an individual based on their disability.  28 C.F.R. § 35.130(b)(7).

75.     An "individual with a disability" is one who has a physical or mental impairment that substantially limits one or more of their major life activities.  42 U.S.C. § 12102(1).

76.     Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, and working.  42 U.S.C. §

12102(2)(A).   Major life activities also include the operations of major bodily function.   42 U.S.C. § 12102(2)(B).

77.     A "qualified individual with a disability" is one who, with or without reasonable accommodations for her disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of the public entity.   42 U.S.C. § 12131(2).

78.     Ehlena is an individual having physical impairments, including but not limited to, spastic quadriplegic cerebral palsy, and although Ehlena is not cognitively impaired, she has been diagnosed with ADHD inattentive type and seizure disorder.

79.     Ehlena's impairments affect her major life activities including caring for herself, walking, balancing, and performing manual tasks.   See 42 U.S.C. § 12102(2)(A).

80.     Ehlena is an otherwise qualified individual with disabilities who meets the essential eligibility requirements to receive services from or participate in the programs or activities of the District and ISD.   *See* 42 U.S.C. § 12131(2).

81.     The District and ISD are public entities forbidden to discriminate based on disability.   *See* 42 U.S.C. § 12132.

82.     The District's and ISD's deliberate refusal to recognize Wonder as a service dog and to permit his access in the instructional setting, discriminated against Ehlena as a person with disabilities who uses a service animal by denying her equal access and otherwise limiting her access to the District's and ISD's facilities, programs, and services as compared to her non-disabled, non-service animal user peers.   *See* 28 C.F.R. §§ 35.130(a), .130(b)(1)(ii) & (vii).

83.     The District and ISD illegally discriminated against Ehlena in their continuing refusal to reasonably accommodate Ehlena as a person with disabilities who uses a service animal.   *See* 28 C.F.R. § 35.130(b)(7).

84.    The ADA defines a service animal as:

...any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items.

*See* 28 C.F.R. § 36.104.

85.    The ADA further requires public entities to modify their "policies, practices, or procedures to permit the use of a service animal by an individual with a disability." *See* 28 C.F.R. § 36.302(c).

86.    Wonder is a dog that was individually trained to perform tasks for Ehlena's benefit. The tasks that Wonder has been trained to perform are uniquely suited to Ehlena's needs as a person with a disability.

87.    The District's and ISD's refusal to grant Ehlena's requested accommodations was illegal disability-based discrimination that violates Title II of the Americans with Disabilities Act of 1990.

88.    The District's and ISD's discrimination was intentional as the District and ISD knowingly refused to accommodate Ehlena despite having full knowledge that she is a qualified individual with disabilities and that she relied upon Wonder as a service dog under the ADA to obtain equal access to the District's and ISD's facilities, programs, and services as compared to her non-disabled, non-service animal user peers.

89.    As a proximate cause of these violations of Title II of the Americans with Disabilities Act, Ehlena has suffered harm as set forth above.

### THIRD CLAIM FOR RELIEF AGAINST THE NAPOLEON COMMUNITY SCHOOLS, JACKSON COUNTY INTERMEDIATE SCHOOL DISTRICT, AND PAMELA BARNES
### MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

90.     Plaintiff incorporates all prior allegations.

91.     The Michigan Persons with Disabilities Civil Rights Act (the "Michigan Act") prohibits educational institutions to exclude or deny people with disabilities the full benefits of their programs, activities, and facilities or to discriminate based on disability.  M.C.L. § 37.1101 *et seq.*

92.     The District and ISD are educational institutions as the term is defined in M.C.L. § 37.1401.

93.     Barnes is an agent of an educational system as the term is defined in M.C.L. § 37.1401.

94.     Ehlena is a person with a disability as that term is defined in the Michigan Act because she has physical impairments, including but not limited to, spastic quadriplegic cerebral palsy, and although Ehlena is not cognitively impaired, she also has been diagnosed with ADHD inattentive type and seizure disorder.

95.     Ehlena's disabilities substantially limit one or more of her life activities and is unrelated to her ability to use and benefit from Defendants' educational activities, programs, and facilities.

96.     Despite her disabilities, Ehlena is otherwise qualified to use and benefit from the District's and ISD's educational activities, programs, and facilities.

97.     Defendants' refusal to recognize Wonder as a service dog and to permit his access in the instructional setting, discriminated against Ehlena as a person with disabilities who uses a service animal by denying her equal access and otherwise limiting her access to Defendants'

15

facilities, programs, and services as compared to her non-disabled, non-service animal user peers. M.C.L. § 37.1402.

98.    As a proximate cause of these violations of the Michigan Persons with Disabilities Act, Ehlena has suffered harm as set forth above.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

    a.  Enter judgment in her favor against Defendants;

    b.  Issue a declaration stating that Defendants violated Plaintiff's rights under Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act and the Michigan Persons with Disabilities Civil Rights Act;

    c.  Award her damages in an amount to be determined at trial;

    d.  Award attorneys' fees pursuant to the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. § 1988 and the Michigan Persons with Disabilities Civil Rights Act; and

    e.  Grant any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff respectfully requests a jury trial on all issues triable to a jury.

Respectfully submitted,

/s/ Peter M. Kellett
Peter M. Kellett (P34345)
James F. Hermon (P53765)
Brandon M. Blazo (P71172)
Dykema Gossett PLLC
Cooperating Attorneys, American
    Fund of Michigan
400 Renaissance Center
Detroit, MI  48243
Telephone:  (313) 568-6800
pkellett@dykema.com
jhermon@dykema.com
bblazo@dykema.com

/s/Denise M. Heberle
Denise M. Heberle (P64145)
Heberle & Finnegan
Cooperating Attorneys, ACLU
    Fund of Michigan
2580 Craig Road
Ann Arbor, MI 48103
Telephone: (734) 302-3233
dmheberle@gmail.com

Attorneys for Plaintiffs

Dated: December 17, 2012

/s/ Michael J. Steinberg
Michael J. Steinberg (P43085)
Kary L. Moss (49759)
American Civil Liberties Union
    Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone: (313) 578-6814
msteinberg@aclumich.org
kmoss@aclumich.org

/s/Gayle C. Rosen
Gayle C. Rosen (P46874)
Cooperating Attorney, ACLU
    Fund of Michigan
715 N. University Ave., Suite 202
Ann Arbor, MI  48104
Telephone: (734) 763-9920
gaylrose@umich.edu

# Exhibit A



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS, REGION XV**

600 SUPERIOR AVENUE EAST, SUITE 750
CLEVELAND, OH  44114-2611

REGION XV
MICHIGAN
OHIO

**MAY 0 3 2012**

Jordan M. Bullinger, Esquire
LaPointe & Butler, P.C.
Attorneys at Law
2143 Commons Parkway
Okemos, Michigan 48864-3987

Re: OCR Docket #15-10-1268 and #15-10-1269

Dear Mr. Bullinger:

This letter is to inform you of the disposition of the above-referenced complaints filed against the Napoleon Community Schools (the District) and the Jackson County Intermediate School District (the ISD), which the U.S. Department of Education (Department), Office for Civil Rights (OCR) received on July 30, 2010.  The Complainant alleged that the District and the ISD discriminated against an elementary school student (the Student) on the basis of her disabilities.  Specifically, the Complainant alleged that: (1) the District and the ISD excluded the Student from and/or limited her participation in their educational programs and activities when they refused to allow the Student to have her dog, a trained service animal, accompany her to school; and (2) the District treated the Student differently from students without disabilities by limiting her outside recess activities choices when students without disabilities were not required to similarly limit their choices.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*
*www.ed.gov*

Page 2 – Jordan M. Bullinger, Esq.

OCR is responsible for enforcing Section 504 of the Rehabilitation Act of 1973,
29 U.S.C. § 794, and its implementing regulation, 34 C.F.R. Part 104. Section 504
prohibits discrimination on the basis of disability by recipients of Federal financial
assistance from the Department. OCR is also responsible for enforcing Title II of the
Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.*, and its implementing
regulation, 28 C.F.R. Part 35. Title II prohibits discrimination on the basis of disability
by public entities. As recipients of Federal financial assistance from the Department and
as a public school system, the District and the ISD are subject to these laws. OCR
therefore had jurisdiction to investigate this complaint.

Based on the complaint allegations, OCR investigated the following issues:

- whether the District and the ISD (collectively, the Recipients) excluded a
  qualified student with a disability from participation in, denied her the benefits of,
  or otherwise subjected the student to discrimination on the basis of disability in
  violation of the Title II implementing regulation at 28 C.F.R. § 35.130(a) and the
  Section 504 implementing regulation at 34 C.F.R. § 104.4(a);

- whether the Recipients afforded a qualified student with a disability an
  opportunity to participate in or benefit from an aid, benefit, or service that was not
  equal to that afforded to others in violation of the Title II implementing regulation
  at 28 C.F.R. § 35.130(b)(1)(ii) and the Section 504 implementing regulation at
  34 C.F.R. § 104.4(b)(1)(ii); and

- whether the District provided different or separate aids, benefits, or services to a
  qualified student with a disability without such action being necessary to provide
  the student with the aid, benefit, or service that is as effective as that provided to
  others in violation of the Title II implementing regulation at 28 C.F. R.
  § 35.130(b)(1)(iv) and the Section 504 implementing regulation at 34 C.F.R.
  § 104.4(b)(1)(iv).

In conducting its investigation, OCR reviewed information and documentation provided
by both the Complainant and the Recipients. After a careful analysis, OCR has
determined that the evidence is sufficient to conclude that the Recipients excluded the
Student from and/or limited her participation in their educational programs and activities
when they refused to allow her to have her service animal accompany her in parts of the
school's program in violation of the Title II implementing regulation at 28 C.F.R.
§ 35.130(a) and the Section 504 implementing regulation at 34 C.F.R. § 104.4(a). In
addition, OCR has determined that the Recipients did not afford the Student an
opportunity to participate in or benefit from an aid, benefit, or service that was not equal
to that afforded to others in violation of the Title II implementing regulation at 28 C.F.R.
§ 35.130(b)(1)(ii) and the Section 504 implementing regulation at 34 C.F.R.
§ 104.4(b)(1)(ii). With respect to the alleged different treatment regarding recess, prior to
the completion of OCR's investigation of that issue, the Recipients asked to resolve the
complaint allegation pursuant to Section 302 of OCR's case processing manual.

Page 3 – Jordan M. Bullinger, Esq.

- **Summary of Case Investigation - Service Animal Allegation**

The Student is eight years old and has cerebral palsy, which significantly limits her motor skills and mobility but does not impact her cognitively. For instance, she has significant weakness in her hip, leg, and knee muscles, which affects her ability to balance herself while using a walker. The Student also has a diagnosis of attention deficit hyperactivity disorder (ADHD) and has a history of seizures.

During the 2009-2010 school year, the time period at issue in this complaint, the Student was six years old and attended kindergarten at the District's Ezra Eby Elementary School (the School). The District placed the Student in a general education classroom with special education supports pursuant to an Individualized Education Program (IEP). The supports included: one-to-one paraprofessional assistance, occupational therapy, physical therapy, speech language services, extended school year services, and resource program services. The ISD was responsible for serving the Student through the provision of and supervision over the special education services.

Due to the alleged disability discrimination, the Complainant did not return the Student to the District at the start of the 2010-2011 school year or since. Instead, the Complainant enrolled the Student in a virtual academy pending the outcome of this complaint. The Student currently is receiving education services through the virtual academy at the first- and second-grade level.

In May 2008, the Student's pediatrician wrote a prescription for a service animal for the Student. During the 2008-2009 school year, the Student's family engaged in fundraising activities in the School community to help secure funds to obtain the service animal, of which the District was aware. In March 2009, the Complainant notified the District that the family had raised the necessary funds and that the family intended to obtain a service animal that would accompany the Student throughout the school day during the 2009-2010 school year. At that time, the Complainant also requested a copy of the District's policies regarding service animals. The Complainant informed OCR that the Superintendent appeared supportive at that time and, although the principal raised some concerns about allergies and liability, it was her understanding that the District would permit the Student to have the service animal at school.

On October 12, 2009, the principal received a letter from the Complainant, informing him that the Student would be missing school to go to the 10-day training with her service animal and of the expectation that the service animal would attend school with the Student, requesting a copy of the District's policies regarding service animals, and requesting a meeting to discuss transition of the service animal into the school setting. In October 2009, the Student attended, along with the Complainant, a 10-day intensive training at the service animal training facility where she obtained her service animal. Prior to that time, the service animal received 10 to 12 months of training at the facility, including training specific to the Student, based on a comprehensive application submitted by the Student, which included a video of the Student demonstrating her functioning in various settings and her individual needs.

Page 4 – Jordan M. Bullinger, Esq.

The Complainant was trained as the service animal's handler, because the Student currently is not physically strong enough to handle the service animal on her own. The Student was responsible for commanding the service animal, and the handler physically managed the service animal, including caring for its physical needs. The service animal, the Student, and the Complainant took and passed a public access test and were certified as a team by the training facility. The service animal must be taken back to the training facility once each year to be retested and recertified. The Complainant indicated that, once the Student is able to handle the service animal on her own, she and the service animal can be recertified as a team of two. Based on Recipient records, OCR learned that the Complainant provided the Recipients with documentation of the service animal's training, including a list of tasks the service animal has been trained to perform for the Student, as well as the handler and service animal training certificates. In addition, the Complainant provided the District with letters from the Student's treating physicians supporting the Student's need for the service animal, which stated that the service animal would increase the Student's independence, that the service animal should be permitted to assist the Student with mobility and transition, and that the service animal would assist the Student in developing more independent motor skills.

According to the Complainant, when the Student returned to school on October 23, 2009, after the training, the Complainant and the service animal dropped the Student off at her classroom. Upon returning home, the Complainant received a telephone call from the principal, who told her that the service animal could not accompany the Student to school, because the principal had received complaints that other students were fearful of the service animal and that the School needed to do more research before allowing the service animal to attend with the Student. The District does not dispute that, in October 2009, it told the Complainant that the service animal was not allowed to accompany and assist the Student at school and throughout the school day.

The Complainant stated that, in November 2009, she asked to be permitted to drop the Student off at her classroom with the service animal, asserting to the Recipients that, as the School is a public place, she had the right to do so. She stated that, starting in December 2009, the Recipients permitted her to drop the Student off at her classroom with the service animal on numerous occasions. According to the Complainant, during that time, the service animal assisted the Student with taking off her coat and, on at least one occasion, with retrieving her dropped lunchbox.

The Recipients scheduled a meeting with the Complainant, which was held on December 11, 2009. According to the Complainant, only administrators from the District and the ISD met with the family on that date. The Complainant shared the specific tasks the service animal was trained to do to assist the Student and the ways in which the service animal would allow the Student to access the educational environment with increasing independence while reducing the Student's reliance on a human aide. The Complainant stated that the Recipients claimed they needed documentation proving the dog was certified as a service animal. The Complainant stated that the Recipients told her they would take away the aide from the Student's IEP services if the Student brought the service animal to school. She also stated, and Recipient records revealed the

Page 5 – Jordan M. Bullinger, Esq.

Complainant documented in a letter to the Recipients, that the Recipients cited various reasons during the meeting for not allowing the service animal, including concerns that other students or faculty would have allergies; fear that other students or staff would have phobias related to service animals; concerns about the service animal having an accident in the building; and concerns that the service animal would be a distraction to other students. She stated that she was also told the Student did not need a service animal because she already had an aide. The Complainant asserts that she was told the service animal would not be permitted to attend school with the Student for these reasons.

The Recipients, on or around January 4, 2010, received a letter from another of the Student's treating physicians, stating that the Student's service animal assists the Student with mobility issues, with the goal of increasing the Student's independent motor skills. The letter emphasized that the Student would continue to require an aide when using the service animal. The Recipients held another IEP meeting for the Student on January 7, 2010. Documentation submitted by the Recipients shows that, at the January 7 meeting, the IEP team considered whether the service animal would be permitted by examining whether the service animal was necessary to provide the Student with a free appropriate public education (FAPE). The IEP team considered the Student's ability to handle the service animal on her own, as well as the impact of the service animal on the learning environment. Specifically, the IEP team considered the following questions:

- What disability-related educational need is the service animal intended to address?

- Taking into account the educational plan currently in place for the Student, including the provision of an individual aide, will the service animal enhance or hinder the Student's ability to progress in the general curriculum?

- Is the Student currently capable of being responsible for the service animal?

- Given the age and maturity level of the Student and her classmates, can the distraction created by the service animal be accommodated without comprising the learning environment?

The IEP team concluded that the Student was being successful in school environment without the service animal, that all of her needs were being met by the program and services in place, and that adding the service animal would not be beneficial to the Student. The IEP team also concluded that the Student was not entitled to utilize the service animal at school, because an adult aide was performing the tasks the service animal would perform for the Student. The Recipients therefore concluded that the Student was receiving a FAPE. The Complainant signed the IEP, noting her disagreement. At the January 7 meeting, the Complainant agreed to mediation to attempt to resolve issues relating to the service animal. The first mediation session occurred on January 29, 2010.

Page 6 – Jordan M. Bullinger, Esq.

Based on Recipient records, OCR learned that, on March 18, 2010, the physical therapist and speech language pathologist that treat the Student outside of school submitted a letter to the Recipients, explaining how they incorporate the service animal into the therapies they provide the Student. Specifically, the therapists explained how the service animal had accompanied the Student to therapy since November of 2009 and had been incorporated into therapy in a number of ways. For example, the service animal assisted the Student with directional control of her walker, with ambulation, and with stabilizing herself while transitioning into and out of her walker from the floor. The Student used the service animal as a bridge for transitioning from her walker to a standing or seated position at a table. She also consistently used the service animal safely to improve her sitting balance by having the service animal provide posterior support as needed. The letter also described how the service animal was directed behind or to the side of the Student when she was standing at a supportive surface for improved safety. Additionally, the therapists explained that the Student used the service animal to safely pick up dropped items. The letter stated that, although the Student still needed adult stand-by assistance for added safety, her independence with transitioning was improving.

The parties signed a mediation agreement on March 22, 2010. As the result of the mediated agreement, the District allowed the service animal to attend school, starting on April 12, 2010, for a 30-day trial basis, with limitations placed on: the settings in which the service animal could accompany the Student; the activities with which the service animal could assist the Student; and the proximity of the service animal and the handler to the Student, including requiring the service animal to sit in the back of the room away from the Student. The trial period did not begin until April 12, because the Recipients required an additional ten calendar days prior to the start of the 30-day trial period in order to notify other students' parents and staff about the service animal and to solicit concerns related to the service animal from them. The trial period was extended on May 21, 2010, to end on June 11, 2010, the last day of school.

According to a letter the Recipients' attorney submitted to OCR on November 5, 2010, as well as other documents submitted by the Recipients, the express purpose of the trial period was to allow them time to evaluate and further observe the service animal, as well as the third-party handler (i.e., the Complainant), in the school setting. During the trial period, records kept by District staff who observed the service animal during the trial period contain detailed notes of each time: the service animal required more than one command or attempt to complete a task, because the service animal did not successfully complete the task on the first try; the handler read a book or magazine, took notes, typed on her cell phone, said anything to or responded to a staff person or another student, or left the room to take her other child to his classroom before the bell rang; the Student did not use the service animal when she could have used the service animal; or the Student made a face or seemed displeased when something the service animal retrieved for her had slobber on it. Based on Recipient records, OCR learned that, during the trial period, the Recipients prohibited the Student from participating in school-related activities such as a school play, "Relay for Life," and "field day" with the service animal. Recipient records revealed that the Recipients also prohibited the service animal from accompanying and assisting the Student during recess, lunch, computer lab, library

Page 7 – Jordan M. Bullinger, Esq.

activities, and other specials, and prohibited the service animal from assisting the Student during the provision of therapy services. Furthermore, according to letters, handwritten notes, and emails that the Recipients submitted to OCR, the Recipients forbade the use of the service animal for certain tasks that the service animal had been specifically trained to do, such as assisting the Student with toileting. In order for the Student to be allowed to use the service animal for toileting, the Recipients required that she demonstrate her use of the service animal while using the toilet, with the stall door open and four adults observing, which embarrassed her.

The School principal kept a handwritten log of parent and staff concerns expressed about the service animal, which the Recipients submitted to OCR along with emails received about the service animal. These showed that one teacher and two students were reportedly allergic to dog dander, one teacher had a phobia about dogs, and one parent expressed concern about her child being in the presence of a dog, because the child had been attacked by a dog several years before. Four parents submitted concerns that the service animal might be a distraction to other students, although only two of the parents' children were in the same classroom as the Student.

The Recipients documented that the service animal barked on one occasion and growled on another occasion while at the School. The growling incident occurred just after school had ended and students were being released. The barking incident also occurred at the end of the school day. Based on Recipient records, OCR learned that the barking occurred when the service animal saw two boys roughhousing. The Complainant told OCR, and documentation submitted by the Recipients confirms, that she told the service animal to stop on each of these occasions and that he remained under her control.

According to letters Recipients submitted to OCR, including a letter, dated November 5, 2010, from the Recipients' attorney, the Recipients' position is that they are not required to permit the service animal to accompany and assist the Student, because they are meeting all of the Student's educational needs through the provision of an aide. They do not acknowledge the dog as a service animal; one articulated reason for this position at the time the OCR opened the complaint was that the Student could not handle the dog on her own. The Complainant contends that the service animal provides the Student with increased independence and that the Recipients' refusal to allow the service animal to accompany and assist the Student at school denies the Student equal access to the Recipients' program by not allowing her to increase her independence and by forcing her to rely on an aide instead of decreasing her reliance on others.

During its investigation, OCR reviewed the District's policy with respect to service animals (the Policy) that was provided by the District. This policy is titled "Guidelines— Office of the Superintendent, Napoleon Community Schools," with the heading "Access to Equal Educational Opportunity." The guidelines are four pages long, and only one provision, under "Facilities," discusses "guide dogs." The Policy requires students seeking to utilize a guide dog to assist the student at school facilities, events, and programs to provide evidence of the dog's certification for that purpose. The Policy also states that proof of liability insurance must be provided if a dog is still in training.

Page 8 – Jordan M. Bullinger, Esq.

OCR identified numerous compliance concerns with the Policy.  For example, the District's policy does not contain a definition of "service animal" and, instead, uses the more limited term "guide dog."  Additionally, the Policy requires a student seeking to use a service dog in the school environment to provide documentation of the dog's certification, whereas the Title II regulation explicitly states that public entities cannot require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal.  Moreover, the Policy does not specify the permissible inquires that a public entity can make and the circumstance in which the public entity may not make inquiries, such as when it is readily apparent that an animal is trained to do work or perform tasks for an individual with a disability.  The Policy also does not specify the circumstances in which the service animal may be properly excluded, including the proper inquiries that must be made when the District believes a service animal presents a direct threat to others.

- **Applicable Legal Standards**

OCR is responsible for enforcing Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulation, 34 C.F.R. Part 104, as well as Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.*, and its implementing regulation, 28 C.F.R. Part 35, which prohibit discrimination on the basis of disability by recipients of Federal financial assistance from the Department and by public entities, respectively.  As recipients of such financial assistance and as public institutions, the Recipients are subject to these laws.  Title II is not to be construed to provide a lesser standard than the standards applied under Section 504.  The Title II regulation in effect at the beginning of the events at issue in this complaint has since been amended.  The new Title II regulation took effect on March 15, 2011.

The Section 504 regulation, at 34 C.F.R. § 104.33, requires a recipient school district to provide a free appropriate public education (FAPE) to each qualified individual with a disability within its jurisdiction, regardless of the nature or severity of the individual's disability.  A FAPE is defined as the provision of regular or special education and related aids and services that are designed to meet the individual educational needs of individuals with disabilities as adequately as the needs of individuals without disabilities are met and which have been developed in accordance with process requirements of 34 C.F.R. §§ 104.34 (educational setting), 104.35 (evaluation and placement), and 104.36 (procedural safeguards).  In conformance with Appendix A of the Section 504 implementing regulation, it is OCR's policy that, except in extraordinary circumstances, OCR does not review the results of individual placement decisions or resolve disputes over the content of education plans, so long as the procedural requirements of the Section 504 regulation regarding identification, evaluation, placement, and procedural safeguards are met.

Page 9 – Jordan M. Bullinger, Esq.

As a general rule, a school district's responsibilities to students with disabilities in the elementary and secondary setting may be satisfied through adherence to Section 504 FAPE procedures. However, there are situations in which a student with a disability may allege disability discrimination that is properly analyzed as a question of alleged different treatment, program exclusion, or failure to provide equal opportunity on the basis of disability under the Section 504 implementing regulation at 34 C.F.R. §§ 104.4(a) and (b) and the Title II implementing regulation at 28 C.F.R. §§ 35.130(a) and (b) and/or as a denial of a reasonable modification under the Title II implementing regulation at 28 C.F.R. § 35.130(b)(7).

In some circumstances, Title II provides greater protections than Section 504 for persons with disabilities. Both the current Title II regulation and the former Title II regulation, which was in effect at the time of the Recipients' alleged non-compliance, prohibit recipient and public school districts from, on the basis of disability, excluding a qualified person with a disability from participating in, denying a student with the benefits of, or otherwise subjecting a student to discrimination under any district program or activity. In addition, both the current and former Title II regulations require public entities to make reasonable modifications to policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modification would fundamentally alter the nature of the service, program, or activity.

Despite the lack of a specific provision in the former Title II regulation, the U.S. Department of Justice (DOJ) had taken the position that the ADA required schools, including those responsible for elementary and secondary education, to allow individuals with disabilities to be accompanied by service animals except for rare instances in which the animals' actual behavior poses a direct threat to the safety of others or results in a fundamental alteration of the nature of a program.

The current Title II regulation clarifies that public entities must modify polices, practices, or procedures to permit the use of a service animal by an individual with a disability. The regulation implementing Title III of the Americans with Disabilities Act of 1990 in effect at the same time of the former Title II regulation and therefore during the time at issue in this complaint defined "service animal" as any guide dog or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items.

Under the former and the current Title II regulation, a public entity is required to permit an individual with a disability to be accompanied by the individual's service animal in all areas of a public entity's facilities where members of the public; participants in services, programs, or activities; or invitees, as relevant, are allowed to go. In addition, a public entity is not permitted to ask about the nature or extent of a person's disability or require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal. If it is not readily apparent that an animal is trained to do work or

Page 10 – Jordan M. Bullinger, Esq.

perform tasks for an individual with a disability, the public entity is permitted to make two inquires to determine whether an animal qualifies as a service animal: 1) if the animal is required because of a disability; and 2) what work or task the animal has been trained to perform. Those inquiries would not be permitted if, for example, the dog is observed providing assistance with stability or balance to an individual with an observable mobility disability.

The current Title II regulation clarifies that an individual with a disability is not required to be the animal's handler in order to be covered by the rule's provisions.

A public entity may ask an individual with a disability to remove a service animal from the premises if the animal is out of control and the animal's handler does take effective action to control it, if the animal is not housebroken, or if the animal poses a direct threat to the health and safety of others. The determination of whether a service animal poses a direct threat must be based on an individualized assessment and reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

Application of the Title II standard advances Congress's finding in enacting Title II that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, [and] independent living."

- **Analysis and Conclusion**

As a threshold matter, the evidence OCR obtained establishes that the Student has a disability and is entitled to the protections of these laws. The evidence also supports that the dog in question meets the definition of a "service animal" and that the Recipients had sufficient information to make that determination. The data submitted by the Recipients establishes that it was readily apparent that the animal was trained to do work or perform tasks for an individual with a disability. Therefore, the Recipients should have modified their policies and practices to permit the service animal to accompany and assist the Student through the school day, as no further inquiries were permissible. Instead, the Recipients held multiple meetings, did not acknowledge the dog was a service animal, and repeatedly stated that the Student's needs were being met by an aide. When the Recipients did permit the service animal to be brought onto District facilities, they placed many restrictions on its use, in effect preventing the service animal from serving the Student.

In certain circumstances, limiting the ability of a student and the parent to choose the particular personal aid, such as mobility aids, would inappropriately inhibit the student's independence and result in discrimination. For example, a school district would violate the antidiscrimination requirements if it required a student who uses a wheelchair to be carried or if it required a blind student to be led through the classroom by holding the arm of his teacher instead of permitting the student to use a service animal or a cane. The

Page 11 – Jordan M. Bullinger, Esq.

Recipients' assertions that the Student does not need her service animal for school, because they will provide her a human aide, similarly violate the antidiscrimination provisions of Section 504 and Title II.

In applying the Section 504 FAPE standard, the Recipients determined that the Student was not entitled to utilize the service animal at school, because all of the tasks the animal would perform for the Student were being performed by an adult aide; thus, the Recipients concluded that the Student was receiving a FAPE. A Section 504 FAPE analysis in this case, however, fails to take into account one of the fundamental purposes of Title II: to increase the independence of individuals with disabilities. In addition, as noted above, Section 504 includes provisions relating to equal opportunity that support providing the Student with the opportunity to access the District's program as independently as possible. Moreover, the decision to deny the Student the service animal in the school setting would have wider implications for the Student outside of the school day. Activities that the service animal performs for the Student during school, such as providing assistance with balance and support, retrieving dropped items, and taking off her coat, are the same types of activities for which the Student uses the service animal outside of the school.

In this case, contemporaneous documentary evidence demonstrates that the service animal became confused about whom to assist when the service animal and the handler were repeatedly made to sit in the back of the classroom away from the Student during the trial period. This evidence suggests that refusing to allow the service animal to assist the Student at school, which she is required to attend for nine months a year, would result in a more prolonged and complete separation that would likely cause the Student's working relationship with the service animal to deteriorate.

Based on the foregoing, OCR has determined that the Recipients violated Section 504 and Title II by failing to modify their policies, practices, or procedures to permit the Student's service animal to accompany her to and assist her at school, thus denying and/or significantly limiting the Student's ability to access the District's programs and activities with as much independence as possible.

The Recipients do not admit any violation of Section 504 of the Rehabilitation Act of 1973 or Title II of the Americans with Disabilities Act of 1990 with regard to the allegations in the complaint and do not agree with the legal conclusions or factual determinations contained within this letter of findings. Notwithstanding their disagreement, the Recipients, in the interest of resolving this matter, voluntarily submitted the enclosed Resolution Agreement (the Agreement), which, when fully implemented, will resolve the identified compliance concerns relating to Section 504 and Title II and the Student's service animal. Specifically, the Agreement requires the Recipients to invite the Student to return to school at the District and to be accompanied and assisted by her service animal at school in all school-related activities; to convene a meeting of School administrators and all staff who will work with the Student and the Student's parents to create a plan for fully and effectively integrating the service animal into the school environment and using the service animal for all activities with which the

Page 12 – Jordan M. Bullinger, Esq.

service animal is trained to assist the Student, and to determine the services the School can provide to encourage and ensure the full and effective integration of the service animal into the school environment; to provide training to School staff and an assembly for students at the School on the role of service animals; and to revise and submit to OCR for review their policies and procedures with respect to service animals, and, once those policies are approved by OCR, to adopt the policies and procedures, publish them on its website, and notify, by effective means, students, parents, staff, and guardians of the policies and procedures as well as where a copy may be obtained.

- **Summary of Investigation to Date – Alleged Different Treatment Based on Disability**

The Complainant also alleged that, during the 2009-2010 school year, the District initially prohibited the Student from using playground equipment at the School, even though the Student was capable of using it and used it with her parents after school, and that the District later treated her differently from students without disabilities by requiring her to select only two activities before going outside for recess, while students without disabilities were not required to limit their choices in any way.  Although the Letters of Notification issued by OCR in this case also included an allegation that the District playground equipment at the School was inaccessible, during the investigation, the Complainant clarified that she was not raising this as an allegation and that her allegation focused on the District's limiting the Student's use of the playground.  The Complainant told OCR that she and her husband have allowed the Student to play on the playground equipment after school.  She explained that, because of the Student's disability, the Student needed some assistance but that, with assistance, most of the playground equipment was usable by her.

According to the Recipients, the Student's special education aide was responsible for accompanying the Student during outdoor recess, including allowing the Student to play on playground equipment.  The aide began keeping daily logs on April 12, 2010, at the start of the trial period for the service animal, through the end of the school year.  OCR reviewed the aide's daily logs.  The logs indicate that, prior to outdoor recess time, the Student was told to select two activities during recess.  In one log entry, dated April 15, 2010, the aide indicates that, when the Student asked about playing on the slide, the aide replied that there were too many kids out there (on the playground) and that it could be dangerous.

OCR reviewed summary notes of the Student's May 3, 2010, IEP review provided by the Recipients, in which the team is noted as having discussed playground opportunities for the Student.  The notes indicate that the Student's parents wanted her to be able to participate on the playground slide and to choose the activity that she would like to participate in, although they preferred that she use the mileage track only once per day.  The summary indicates that an extra aide could help to catch the Student when she was going down the slide, could provide the Student with options so that she could choose activities, and could check into modifying activities such as sidewalk chalk, bocce ball, and kickball so that the Student could participate.  The IEP summary notes made no

Page 13 – Jordan M. Bullinger, Esq.

specific references to what activities would be appropriate for the Student to be involved in during recess.  The only general reference to recess was listed under the "Adaptive/Independent Living Skills" section of the Student's IEP:

> She also requires adult assistance when using the restroom, dressing for outdoors, recess and moving between her walker and a chair as well as while in special classes.  (gym, music and art).  [The Student]'s condition of Cerebral Palsy affects her balance, strength, and endurance and ability to complete all classroom activities both academic and social.

Prior to the completion of OCR's investigation of this allegation and any compliance findings, the Recipients indicated to OCR that they would like to resolve this allegation.

- **Applicable Legal Standards**

The regulations implementing Section 504 provides at 34 C.F.R. § 104.4(a) that no qualified person with a disability shall, on the basis of disability be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination by recipients of Federal financial assistance from the Department.  Provision of different aids, benefits, or services in a recipient's programs and activities on the basis of disability is prohibited unless such action is necessary to provide the student with a disability with aids, benefits, or services that are as effective as that provided to others.  34 C.F.R. § 104.4(b)(1)(iv).  Title II contains similar provisions at 28 C.F.R. §§ 35.130(a) and (b)(1)(iv).

- **Resolution**

As noted above, before OCR completed its investigation, the Recipients asked to resolve the playground issue voluntarily pursuant to Section 302 of OCR's Case Processing Manual, which provides that an allegation may be resolved before the conclusion of an OCR investigation if a recipient asks to resolve the allegation and signs a resolution agreement that addresses the complaint allegation.  Such a request does not constitute an admission of liability on the part of the recipient institution, nor does it constitute a determination by OCR that the recipient institution has violated any of the laws that OCR enforces with respect to that allegation.  The provisions of the resolution agreement are to be aligned with the complaint allegation or information obtained during the investigation and consistent with applicable regulations.

As noted above, the Recipients have signed the enclosed resolution agreement, which, once implemented will fully address the complaint allegation related to recess.  The agreement requires the Recipients to allow the Student to select her recess playground activities in the same manner as similarly situated students without disabilities and to be assisted by her service animal.  The agreement also requires the District to notify all staff at the School who monitor the Student during recess, or who monitor recess activities generally, of these nondiscrimination requirements.

Page 14 – Jordan M. Bullinger, Esq.

- **Conclusion**

This concludes our investigation of this matter.  OCR will monitor the Recipients' implementation of the Agreement.  If the Recipients do not fully implement the Agreement, OCR will reopen the case and take appropriate action to ensure the Recipients' full compliance with Section 504 and Title II.

This letter sets forth OCR's determination in an individual OCR case.  This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  A complainant may have the right to file a private suit in Federal court whether or not OCR finds a violation.

If you have any questions about this letter, please contact Ms. Karla K. Ussery, Team Leader, by telephone at (216) 522-4970 or by e-mail at Karla.Ussery@ed.gov.  Please direct any communication about the Recipients' implementation of the Agreement to Ms. Vanessa Coterel, who will be monitoring that implementation.  Ms. Coterel can be reached at (216) 522-4974 or Vanessa.Coterel@ed.gov.  We look forward to receiving the Recipients' first monitoring report on or before May 31, 2012.

Sincerely,

Catherine D. Criswell
Director

Enclosure

Resolution Agreement
Napoleon Community Schools, OCR Docket #15-10-1268
Jackson County Intermediate School District, OCR Docket #15-10-1269

Napoleon Community Schools and Jackson County Intermediate School District (collectively, the Recipients) agree to enter into this Resolution Agreement for the purpose of amicably and expeditiously resolving OCR Docket #15-10-1268 and #15-10-1269 and ensuring compliance with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulation at 34 C.F.R. Part 104, and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.*, and its implementing regulation at 28 C.F.R. Part 35, as amended during the course of this investigation.   By entering into this Agreement, the Recipients do not admit any violation of Section 504 of the Rehabilitation Act of 1973 or Title II of the Americans with Disabilities Act of 1990 with regard to the allegations in the complaint.  The Recipients do not agree with the legal conclusions or factual determinations contained within the accompanying letter of finding.  Nothing contained in this Agreement shall be considered, construed, or used as an admission of liability, statutory or regulatory violation, or any other illegal act, by the Recipients.  The Recipients agree to take the actions indicated below:

I.   **Individual Student**

A.   **Service Animal**

1.  By May 31, 2012, the Recipients will invite the student at issue in this complaint (the Student) to return to Ezra Eby Elementary School (the school) and notify her that, should she return, she will be provided the opportunity to have a service animal accompany and assist her throughout the school day, in all settings and activities within the school to the extent the service animal has been trained to assist her and to the greatest degree possible.  In implementing this provision, the Recipients specifically acknowledge and agree to the following:

a.  The Recipients will make reasonable modifications to their policies, practices, and procedures as necessary to permit the Student's use of her service animal to do work and perform tasks for the benefit of the Student as an individual with a disability, including tasks to increase the Student's independence, unless doing so would constitute a fundamental alteration of the District's service, program, or activity.   In those circumstances where the Recipients believe that the proposed action would fundamentally alter the service, program, or activity, the Recipients have the burden of proving that compliance with Section 504 and Title II would result in such alteration. The decision that compliance would result in such alteration must be made by the head of the Recipients or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action required to comply with Section 504 or Title II

would result in such an alteration, the Recipients shall take any other action that would not result in such an alteration but would nevertheless ensure that, to the maximum extent possible, the Student, as an individual with a disability, receives the benefits or services provided by the Recipients. The Student will be permitted, in all settings, to be accompanied by and assisted in all activities that a service animal is trained to assist her with throughout the school day, with the limited exceptions discussed in paragraphs I.A (c)-(e) below.

b.  The Recipients will fully integrate the Student and her service animal, including actively encouraging and utilizing all of the types of assistance the service animal has been trained to provide into each setting and activity, including both academic and nonacademic, in which the Student participates throughout the school day with students without disabilities.

c.  Consistent with Title II's regulatory provisions governing the use of service animals, the Recipients will only exclude the Student's service animal from their premises if (i) the service animal is out of control and the animal's handler does not take effective action to control it; or (ii) the service animal is not housebroken.

d.  The Recipients will only limit the settings in which the Student is accompanied by a service animal, the activities with which she uses service animal, and the types of assistance a service animal provides during a particular activity where the Student's use of the service animal would pose a "direct threat." Pursuant to the Title II regulation at 28 C.F.R. § 35.104, a "direct threat" is defined as a significant risk to the health and safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

e.  In making any determination that the Student's use of a service animal would pose a direct threat to the health or safety of others in a particular setting or activity, the Recipients will make an individualized determination, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices or the provision of auxiliary aids or services will mitigate the risk, pursuant to 28 C.F.R. § 35.139.

f.  The Recipients acknowledge their obligation to permit the Student equal access to their programs and activities under Section 504 and Title II through the use of a service animal and, therefore, will not prohibit a service animal from completing tasks for the Student or assisting the Student in completing an activity for the reason that a staff person is

identified to complete that task or assist the Student with that activity for purposes of providing her with a free appropriate public education (FAPE) pursuant to the Student's Individualized Education Program (IEP).

g.  The Recipients will not limit a service animal's or the handler's physical proximity to the Student, except as is provided by paragraphs I.A (c)-(e) above.

h.  Except as provided by paragraphs I.A (c)-(e) above, the Recipients will not limit the Student's activities or separate her from her peers because of her use of a service animal.  For example, the Student will be permitted to participate, while accompanied and assisted by her service animal, in all field trips, extracurricular activities, and other school-sponsored events with her classmates to the maximum extent possible.

i.  The Recipients may place reasonable limitations on the activities that the handler may engage in while in the classroom where the activities are unrelated to the handler's responsibilities regarding a service animal for the purpose of ensuring that the handler's activities do not create a disruption to the education environment.  Napoleon Community Schools agrees to provide the handler with access to facilities, including an adult restroom and a place to take a break or eat lunch.  The handler will be provided copies of and be expected to comply with the Recipients' established policies that apply in the school setting, including those that apply to fire drills and volunteers.  In addition, the handler will submit to a criminal background check that is required of all personnel who regularly interact with children in the school setting.

j.  The Recipients will not refuse the Student the services of an aide for the sole reason that the Student is accompanied by a service animal if aide services are required for the Student to receive a free appropriate public education under the Section 504 regulation at 34 C.F.R. § 104.33.

2.  Should the Student reenroll, the Recipients will promptly convene a transition meeting of School administrators and all staff who will be working with the Student and the Student's parents to ensure the Student's smooth transition back into the school.  At that meeting, the group will determine how to fully integrate the Student's service dog into the educational environment, including in all settings and for all school activities in which the Student participates, including field trips and afterschool/extracurricular activities.  The group will develop a plan to ensure the provision of support and services to fully and effectively integrate the service dog into the school environment and school activities, including how each staff person working directly with the Student, as well as school administrators, understand the requirement to and how to fully and meaningfully support the successful integration of the Student's service animal into all school activities and settings.  The Student's

IEP team also will meet to identify steps to ensure the Student's transition back to school and her receipt of a FAPE.

**REPORTING REQUIREMENTS:** By May 31, 2012, the Recipients will provide OCR with a copy of the notice and invitation issued to the Student's parents pursuant to Item I.A.1 above. Within 30 school days of the Student's reenrollment at the school, the Recipients will submit to OCR documentation to demonstrate their implementation of Items I.A.2 above, including: any documentation produced as a result of the meeting regarding the Student's reintegration into the school with a service animal; the date of the meeting; the names and job titles of the participants; and a copy of the steps or plan developed to ensure the Student's reintegration at school with full use of a service animal and to address the requirements of I.A.1-I.A.2 above.

**B.     Playground**

Napoleon Community Schools will ensure that the Student, regardless of her disability, is provided an equal opportunity to participate in activities on the playground in the same manner as is provided to students without disabilities, including being permitted to spontaneously pick activities on the playground after recess has commenced and to switch activities during recess as students without disabilities are permitted to do. In addition, the Student will be permitted to be accompanied and assisted by a service animal during outdoor recess and will be only limited in that regard for the reasons identified in paragraphs 1.A (c)-(e) above. Napoleon Community Schools will notify relevant staff of this requirement.

**REPORTING REQUIREMENT:** Within 30 school days of the Student's reenrollment at the school, Recipient Napoleon Community Schools will submit to OCR documentation to demonstrate its implementation of Item I.B above, including: the names and positions of all relevant staff notified that the Student must be permitted to spontaneously choose the activities she wishes to participate in during each recess and that she may be accompanied and assisted by a service animal during outdoor recess, the date that each person was notified, the person who provided the notification, and verification that the Student is being provided an equal opportunity to participate in playground activities (verification of this last provision may be demonstrated by making relevant Recipient witnesses available for an OCR interview).

**II.     District-Wide Action**

**A.     Training**

1.     By September 15, 2012, Napoleon Community Schools will provide training to the staff at the School by a person(s) knowledgeable about and who has experience training or working with service animals and a person knowledgeable about the requirements of Section 504 and Title II

regarding service animals.  The training will include a question-and-answer period.

2.   Within 30 school days of the Student's reenrollment at Napoleon Community Schools, Napoleon Community Schools will provide an assembly to all students at the school about service animals.  The assembly will include an age-appropriate discussion of the role of service animals and etiquette when students or staff come into contact with a person using a service animal.

**REPORTING REQUIREMENTS:**   By September 15, 2012, Napoleon Community Schools will provide OCR with documentation to demonstrate its implementation of paragraph II.A.1 above including: the date(s) of the training provided; sign-in sheets with the name and job title of each staff member who attended; the names, titles and qualifications of the individuals who conducted the training; and a copy of any materials used or distributed during the training and an outline of what was covered in the training if not self-evident from the materials.  Within 30 school days of the Student's reenrollment at Napoleon Community Schools, Napoleon Community Schools will provide OCR with documentation to demonstrate its implementation of paragraph I.A.2 above including:  the date of the assembly; a list of the classes of students who attended the assembly; the name and a brief description of the qualifications of the assembly presenter; and any materials used and distributed during the assembly.

B.      **Policies and Procedures**

1.   By May 31, 2012, the Recipients will each draft or revise and submit to OCR for review and approval their policies and procedures regarding the use of service animals by students with disabilities to ensure that the policies and procedures are consistent with the Section 504 regulation at 34 C.F.R. § 104.4 and the Title II regulation at 28 C.F.R. §§ 35.104, 35.130, and 35.136.

2.   Within 30 school days of receipt of the OCR-approved policies and procedures developed pursuant to Item II.B.2 above, each Recipient will: adopt the OCR-approved policies and procedures; publish them on their respective websites; notify parents and guardians of the policies and procedures and where a copy may be obtained by a means that is designed to reach each parent and guardian; and notify staff of the revised policies and procedures by distributing a memorandum to staff or by including notice of them in a staff meeting or in-service training.

**REPORTING REQUIREMENTS:**   By May 31, 2012, each Recipient will submit its revised or drafted policies and procedures pursuant to Item II.B.1 to OCR for review and approval.  Within 30 school days of receipt of the OCR-approved policies and procedures, each Recipient will submit information

documenting its implementation of Item II.B.2 above, including a link to the policies and procedures on each Recipient's website, copies of the written notification issued to parents and guardians, and an explanation as to how staff were notified of the revised policies and procedures.

## GENERAL REQUIREMENTS

The Recipients understand that OCR will not close the monitoring of this agreement until OCR determines that the Recipients have fulfilled the terms of this agreement and are in compliance with Section 504 and its implementing regulation at 34 C.F.R. § 104.4 and 34 C.F.R. Part 104, Subpart D, and with Title II and its implementing regulation at 28 C.F.R. §§ 35.130 and 35.136, which are at issue in this case.

The Recipients understand that, by signing this agreement, they agree to provide data and other information in a timely manner in accordance with the reporting requirements of this agreement. Further, the Recipients understand that during the monitoring of this agreement, if necessary, OCR may visit one or both Recipients, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether each Recipient has fulfilled the terms of this agreement and is in compliance with Section 504 and its implementing regulation at 34 C.F.R. § 104.4 and 34 C.F.R. Part 104, Subpart D, and with Title II and its implementing regulation at 28 C.F.R. §§ 35.130 and 35.136.


_____          4-26-12
Jim Graham, Superintendent                 Date
Napoleon Community Schools


_____          4/25/12
Richard Randell, Director of Special Education Jackson ISD   Date
Jackson County Intermediate School District