UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Stacy Fry, *et al.,*

     Plaintiffs,

v.                              Case No. 12-15507

Napoleon Community Schools, *et al.*,      Sean F. Cox
                                           United States District Court Judge

     Defendants.

_____/

## OPINION & ORDER
## DENYING MOTIONS FOR SUMMARY JUDGMENT WITHOUT PREJUDICE

     Plaintiffs filed this action against Defendants alleging that Defendants violated the

Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act by refusing

to allow the minor student[1] "E.F." to bring her service dog to school with her. The case was

originally assigned to the Honorable Lawrence Zatkoff, who dismissed the case because he

concluded that Plaintiffs were required to exhaust administrative remedies under the Individuals

with Disabilities Education Act (the "IDEA"). The Sixth Circuit agreed with Judge Zatkoff and

affirmed his dismissal. The Supreme Court granted certiorari to address confusion as to the

IDEA's exhaustion requirement, vacated the Sixth Circuit's opinion, and remanded the matter

for consideration of the analysis it set forth in its opinion, *Fry v. Napoleon Commty. Sch.*, __

U.S. __, 137 S.Ct. 743, 197 L.Ed.2d 46 (2017).

     Upon remand, the parties asked to have limited discovery on the issue of administrative

_____

     [1]The child in this action was five years old, just entering kindergarten, when this dispute
began. She is now fourteen years old.

remedies pursued and that discovery has since concluded. The matter is now before the Court on cross-motions for summary judgment, wherein each party asks the Court to rule in their favor as to Defendants' affirmative defense of failure to exhaust administrative remedies under the IDEA. The motions were fully briefed and the Court heard oral argument on August 16, 2018. As explained below, the Court concludes that it cannot make a summary judgment ruling as to this affirmative defense based upon the evidence that was presented in connection with the cross-motions. As such, the Court shall DENY BOTH MOTIONS WITHOUT PREJUDICE.

## BACKGROUND

**A.     Procedural History**

On December 17, 2012, Plaintiff E.F., a minor, by her next friends, Stacy and Brent Fry (her parents), filed this action against Defendants Napoleon Community Schools, Jackson County Intermediate School District, and Pamela Barnes ("Defendants"). The action was assigned to Judge Zatkoff.

### Plaintiffs' Complaint And Request For Relief

Plaintiffs' Complaint asserts that Defendants violated Title II of the ADA and § 504 of the Rehabilitation Act. [2] The Complaint includes a jury demand "on all issue triable to a jury." (D.E. No. 1 at Pg ID 16).

The Complaint alleges that Defendants violated the Rehabilitation Act by "denying [E.F.] equal access" to Ezra Eby Elementary School and limiting her access to the District's and ISD's facilities, programs, and services compared to her non-disabled, non-service animal user peers.

_____

[2]It also included a claim under Michigan's Persons with Disabilities Civil Rights Act, but Judge Zatkoff declined to exercise supplemental jurisdiction over that claim and dismissed it.

(D.E. No. 1 at ¶ 68). It alleges that Defendants' "discrimination was intentional as Defendants "knowingly refused to recognize Wonder as a service dog despite having full knowledge that [E.F.] qualified as an individual with disabilities and relied upon Wonder to obtain equal access to the District's and ISD's facilities, programs, and services as compared to her non-disabled, non-service animal user peers." (*Id*. at ¶ 70).

The Complaint alleges that Defendants violated the ADA by their "deliberate refusal to recognize Wonder as a service dog and to permit his access in the instructional setting, discriminated against [E.F.] as a person with disabilities who uses a service animal by denying her equal access and otherwise limiting her access to the District's and ISD's facilities, programs, and service as compared to her non-disabled, non-service animal user peers." (*Id*. at ¶ 82). It alleges that Defendants "illegally discriminated against [E.F.] in their continuing refusal to reasonably accommodate [E.F.] as a person with disabilities who uses a service animal." (*Id*. at ¶ 83).

The Complaint alleges that Defendants "refusal to accommodate [E.F.'s] disabilities has caused her harm," which includes:

a.    denial of access to Defendants' facilities, programs, and services;
b.    denial of the use of Wonder as a service dog at school from October 2009 to June 2010;
c.    interference with [E.F.'s] ability to form a bond with Wonder from October 2009 to June 2010, which compromised Wonder's ability to effectively assist [E.F.] outside of school;
d.    denial of the opportunity to interact with other students at Ezra Eby Elementary School during the 2010-2011 and 2011-2012 school years when she was homeschooled due to the refusal of Defendants to use Wonder as a service dog at school;
e.    loss of ability to interact with students at Ezra Eby Elementary School and stress caused by leaving the Napoleon Community Schools and enrolling in a new school in a different county for the 2012-2013 academic year; and

3

f.      emotional distress and pain, embarrassment, mental anguish, inconvenience, and loss of enjoyment of life resulting from Defendants' refusal to reasonably accommodate her as a person with a disability who uses a service animal.

(D.E. No. 1 at Pg ID 8-9).

Plaintiffs' Complaint seeks a declaration that Defendants violated Plaintiffs' rights under Section 504 of the Rehabilitation Act and Title II of the ADA, an award of monetary damages[3], and an award of attorney fees.  (D.E. No. 1 at Pg ID 16).

Defendants filed an Answer and Affirmative Defenses on February 11, 2013 (D.E. No. 11) and it includes the following as an affirmative defense: "Plaintiffs have failed to exhaust their administrative remedies generally and specifically with the Individuals With Disabilities Education Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act." (*Id.* at Pg ID 73).

**Judge Zatkoff Grants Defendants' Motion For Judgment On The Pleadings And The Sixth Circuit Affirms.**

On July 24, 2013, Defendants filed a motion asking the Court to dismiss the action pursuant to Fed. R. Civ. P. 12(c), asserting that "[b]ecause of Plaintiff's failure to exhaust administrative remedies, her claim should be dismissed for lack of jurisdiction."  (*Id.* at Pg ID 124).

In an Opinion & Order issued on January 10, 2014, Judge Zatkoff granted Defendants' motion and dismissed Plaintiffs' Complaint without prejudice.  *EF ex rel. Fry v. Napoleon*

---

[3]Money damages *are not* available under the IDEA. *Crocker v. Tennessee Sec. Sch. Athl. Ass'n*, 980 F.2d 382, 386-87 (6th Cir. 1992).  But a plaintiff cannot avoid the IDEA's exhaustion requirements by simply adding a claim for monetary relief.  *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 916 (6th Cir. 2000).

*Commty. Sch*., 2014 WL 106624 (E.D. Mich. 2014). Plaintiffs appealed.

In an Opinion issued on August 5, 2015, a divided panel of the Sixth Circuit affirmed in

*Fry v. Napoleon Commty. Sch*., 788 F.3d 622 (6th Cir. 2015). As the Supreme Court

summarized:

> A divided panel of the Court of Appeals for the Sixth Circuit affirmed on the same ground. In that court's view, § 1415(*l* ) applies if "the injuries [alleged in a suit] relate to the specific substantive protections of the IDEA." 788 F.3d 622, 625 (2015). And that means, the court continued, that exhaustion is necessary whenever "the genesis and the manifestations" of the complained-of harms were "educational" in nature. *Id.,* at 627 (quoting *Charlie F. v. Board of Ed. of Skokie School Dist. 68,* 98 F.3d 989, 993 (C.A.7 1996)). On that understanding of § 1415(*l* ), the Sixth Circuit held, the Frys' suit could not proceed: Because the harms to E.F. were generally "educational"—most notably, the court reasoned, because "Wonder's absence hurt her sense of independence and social confidence at school"—the Frys had to exhaust the IDEA's procedures. 788 F.3d, at 627. Judge Daughtrey dissented, emphasizing that in bringing their Title II and § 504 claims, the Frys "did not allege the denial of a FAPE" or "seek to modify [E.F.'s] IEP in any way." *Id.,* at 634.

*Fry*, 137 S.Ct. at 752.

### The Supreme Court's Opinion

The United States Supreme Court granted certiorari "to address the confusion in the

courts of appeals as to the scope of § 1415(l)'s exhaustion requirement," vacated the Sixth

Circuit's decision, and remanded the case to the Sixth Circuit. *Id.* at 752.

In *Fry*, the Supreme Court held that "Section 1415(l) requires that a plaintiff exhaust the

IDEA's procedures before filing an action under the ADA, the Rehabilitation Act, or similar

laws when (but only when) her suit 'seek[s] relief that is also available' under the IDEA." *Id*. at

752. "The only relief that an IDEA officer can give – hence the thing a plaintiff must seek in

order to trigger § 1415(l)'s exhaustion rule – is relief for the denial of a FAPE." *Id*. at 753.

The Court explained that if a parent's IDEA complaint protested a school's failure to provide some accommodation for a child with a disability, and that accommodation is needed to fulfill the IDEA's FAPE requirement, the hearing officer could (and must) order that relief.  On the other hand, if that accommodation is not needed in order to provide the student with a FAPE, the hearing officer cannot provide the requested relief.  "For that reason, § 1415(l)'s exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a [FAPE].  If a lawsuit charged such a denial, the plaintiff cannot escape § 1415(l) merely by bringing her suit under a statute other than the IDEA – as when, for example, the plaintiffs in *Smith* claimed that a school's failure to provide a FAPE also violated the Rehabilitation Act."  *Id.* at 754.

But if the remedy sought in a suit brought under another statute "is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required." *Id*. at 754.  A school's refusal to make an accommodation might injure the student "in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA.  A complaint seeking redress for those other harms, independent of any FAPE denial, is not subject to" the exhaustion requirement.  *Id*. at 754-55.

The Court held that in determining whether a plaintiff seeks relief for the denial of a FAPE, "what matters" is the gravamen of the plaintiff's complaint, "setting aside any attempts at artful pleading." *Id*. at 755.

"That inquiry makes central the plaintiff's own claims," because, in effect § 1415(l) "treats the plaintiff as 'the master of the claim.'" *Id.* at 755.  As such, in deciding whether the exhaustion requirement applies here, this Court "must therefore examine whether a plaintiff's complaint – the principal instrument by which she describes her case – seeks relief for the denial of an appropriate education." *Id.*  And that inquiry looks to substance, not labels.  Thus,

exhaustion is required "when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed precisely that way." *Id.*

The Court again stressed the IDEA's goal is to provide a student with a FAPE. "By contrast, Title II of the ADA and § 504 of the Rehabilitation Act cover people with disabilities of all ages, and do so both inside and outside schools." *Id.* at 756. Those statutory differences "mean that a complaint brought under Title II and § 504 might instead seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation." *Id.*

The Court then suggested that consideration of a pair of hypothetical questions may help guide the inquiry:

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? *When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.*
>
> Take two contrasting examples. Suppose first that a wheelchair-bound child sues his school for discrimination under Title II (again, without mentioning the denial of a FAPE) because the building lacks access ramps. In some sense, that architectural feature has educational consequences, and a different lawsuit might have alleged that it violates the IDEA: After all, if the child cannot get inside the school, he cannot receive instruction there; and if he must be carried inside, he may not achieve the sense of independence conducive to academic (or later to real-world) success. But is the denial of a FAPE really the gravamen of the plaintiff's Title II complaint? Consider that the child could file the same basic complaint if a municipal library or theater had no ramps. And similarly, an employee or visitor could bring a mostly identical complaint against the school.

> *That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education.* See *supra,* at 751 – 752 (describing OCR's use of a similar example). And so § 1415(*l*) does not require exhaustion.
>
> But suppose next that a student with a learning disability sues his school under Title II for failing to provide remedial tutoring in mathematics. That suit, too, might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable accommodation; the complaint might make no reference at all to a FAPE or an IEP. But can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? *The difficulty of transplanting the complaint to those other contexts suggests that its essence—even though not its wording—is the provision of a FAPE,* thus bringing § 1415(*l* ) into play.

*Id.* at 756 (emphasis added).

In a footnote addressing concerns raised in the concurring opinion, the majority opinion stated that the "point of the questions is not to show that a plaintiff faced with a particular set of circumstances could *only* have proceeded under Title II or § 504 – or, alternatively, could *only* have proceeded under the IDEA.  (Depending on the circumstances, she might well have been able to proceed under both.)  Rather, these questions help determine whether a plaintiff who has chosen to bring a claim under Title II or § 504 instead of the IDEA – and whose complaint makes no mention of a FAPE – nevertheless raises a claim whose *substance* is the denial of an appropriate education."  *Id.* at 757 n.10 (italics in original).

Finally, the Court suggested a "further sign" that should be considered in deciding if the gravamen of a suit is the denial of a FAPE:

> A further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings. In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream.

Recall that a parent dissatisfied with her child's education initiates those administrative procedures by filing a complaint, which triggers a preliminary meeting (or possibly mediation) and then a due process hearing. See *supra,* at 748 – 749. A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE—with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy. Whether that is so depends on the facts; a court may conclude, for example, that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely. But prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term.

*Id*. at 757.

The Court noted that the Sixth Circuit "did not undertake the analysis we have just set forward," and ultimately remanded for that analysis because it lacked all the information required. *Id.*

But before remanding, the Court considered the Fry's complaint, and the hypothetical questions it suggested, and stated as follows:

The Frys' complaint alleges only disability-based discrimination, without making any reference to the adequacy of the special education services E.F.'s school provided. The school districts' "refusal to allow Wonder to act as a service dog," the complaint states, "discriminated against [E.F.] as a person with disabilities ... by denying her equal access" to public facilities. App. to Brief in Opposition 15, Complaint ¶ 68. The complaint contains no allegation about the denial of a FAPE or about any deficiency in E.F.'s IEP. More, it does not accuse the school even in general terms of refusing to provide the educational instruction and services that E.F. needs. See 788 F.3d, at 631 (acknowledging that the Frys do not "state that Wonder enhances E.F.'s educational opportunities"). As the Frys explained in this Court: The school districts "have said all along that because they gave [E.F.] a one-on-one [human] aide, that all of her ... educational needs were satisfied. And we have not challenged that, and it would be difficult for us to challenge that." Tr. of Oral Arg. 16. The Frys instead maintained, just as OCR had earlier found, that the school districts infringed E.F.'s right to equal access—even if their actions complied in full with the IDEA's requirements. See App. to Brief in Opposition 15, 18–19, Complaint ¶¶ 69, 85, 87; App. 34–37; *supra,* at 751 – 752.

And nothing in the nature of the Frys' suit suggests any implicit focus on the adequacy of E.F.'s education. Consider, as suggested above, that the Frys could have filed essentially the same complaint if a public library or theater had refused admittance to Wonder. See *supra,* at 756. Or similarly, consider that an adult visitor to the school could have leveled much the same charges if prevented from entering with his service dog. See *ibid.* In each case, the plaintiff would challenge a public facility's policy of precluding service dogs (just as a blind person might challenge a policy of barring guide dogs, see *supra,* at 751) as violating Title II's and § 504's equal access requirements. The suit would have nothing to do with the provision of educational services. *From all that we know now, that is exactly the kind of action the Frys have brought.*

*Id.* Nevertheless, Court remanded the case so that the history of the proceedings could be considered:

> *But we do not foreclose the possibility* that the history of these proceedings might suggest something different. As earlier discussed, a plaintiff's initial pursuit of the IDEA's administrative remedies can serve as evidence that the gravamen of her later suit is the denial of a FAPE, even though that does not appear on the face of her complaint. See *supra,* at 756 – 758. The Frys may or may not have sought those remedies before filing this case: None of the parties here have addressed that issue, and the record is cloudy as to the relevant facts. Accordingly, on remand, the court below should establish whether (or to what extent) the Frys invoked the IDEA's dispute resolution process before bringing this suit. And if the Frys started down that road, the court should decide whether their actions reveal that the gravamen of their complaint is indeed the denial of a FAPE, thus necessitating further exhaustion.
>
> With these instructions and for the reasons stated, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*Id*. at 758 (emphasis added).

Justice Alito, with whom Justice Thomas joined, concurred in the result but wrote separately to explain that he would not suggest the "clues" included in the majority opinion, particularly with respect to the clue suggesting the court look at whether the parents pursued then abandoned procedures under the IDEA:

The Court provides another false clue by suggesting that lower courts take into account whether parents, before filing suit under the ADA or the Rehabilitation Act, began to pursue but then abandoned the IDEA's formal procedures. *Ante,* at 756 – 758. This clue also seems to me to be ill-advised. *It is easy to imagine circumstances under which parents might start down the IDEA road and then change course and file an action under the ADA or the Rehabilitation Act that seeks relief that the IDEA cannot provide. The parents might be advised by their attorney that the relief they were seeking under the IDEA is not available under that law but is available under another. Or the parents might change their minds about the relief that they want, give up on the relief that the IDEA can provide, and turn to another statute.*

Although the Court provides these clues for the purpose of assisting the lower courts, I am afraid that they may have the opposite effect. They are likely to confuse and lead courts astray.

*Id.* at 759 (emphasis added).

### The Sixth Circuit Remanded To This Court

In an Order issued on July 21, 2017, the Sixth Circuit noted that the case was before it on remand from the United States Supreme Court and then stated:

In addressing whether dismissal was proper under the administrative exhaustion requirement of the IDEA, see 20 U.S.C. § 1415(l), the Court explained that "some important information" is missing about the pre-suit proceedings, and thus "the record is cloudy as to the relevant facts." *Fry v. Napoleon Community Schools, et al.*, 580 U.S. __, __ (slip op., at 19, 20). *Because of the factual nature of the relevant information*, we reverse and remand this case to the district court to determine in the first instance whether "the Frys invoked the IDEA's dispute resolution process before bringing this suit," *id.*, at __ (slip op., at 20), and to proceed to resolve this case in accordance with the Supreme Court's opinion.

(D.E. No. 33) (emphasis added).  The mandate issued on August 15, 2017.  On September 5, 2017, this case was reassigned from Judge Zatkoff to the undersigned.

On October 10, 2017, this Court held a Status Conference with Counsel, after which it issued a text-only order setting "discovery as to Administrative Remedies Pursued due by"

December 11, 2017.

This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(D.E. No. 16 at 2-3).

**The Pending Motions**

On February 9, 2018, Plaintiff filed a "Motion for Partial Summary Judgment to Dismiss Defendants' Affirmative Defense of Failure to Exhaust Administrative Remedies." (D.E. No. 39). Plaintiff complied with the Court's practice guidelines for motions for summary judgment such that its motion included a separate "Statement of Material Facts Not In Dispute" ("Pl.'s "Stmt."). In response to that motion, Defendants filed a response brief (D.E. No. 43) and a separate response to Plaintiff's Statement of Material Facts. (D.E. No. 43-1). Defendants' Statement does not identify any issue of material of fact as to which they contend there is a

12

genuine issue for trial.

On February 12, 2018, Defendants filed a Motion for Summary Judgment (D.E. No. 40). Defendants did not comply with the Court's practice guidelines as their motion does not include a separate Statement of Facts Not in Dispute.

Both motions have been fully briefed. The Court heard oral argument on both motions on August 16, 2018.

## ANALYSIS

### I.      Standard Of Decision

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002). "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "This is so because the nonmovant, in response to a properly made and supported

motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Id.*

## II.    Relevant Facts

Because this issue is before the Court on cross-motions for summary judgment, unless otherwise noted, the Court includes here only undisputed evidence. The Court will also note gaps in the relevant evidence that has been presented by the parties.

E.F. is a minor child with a severe form of cerebral palsy and she is qualified for special education services under the IDEA.

Before enrolling her in the Ezra Eby Elementary School kindergarten program for the 2009-2010 school year, E.F.'s parents informed the school administration that they planned to obtain a service dog for E.F. and expected the animal to attend school with E.F. (Pl.'s & Defs.' Stmts. at ¶ 3). Jim Graham, the Superintendent of the Napoleon Community School District, testified that Stacy Fry so informed him of this during some type of program at the elementary school. He testified that he walked away without saying anything in response. (Graham Dep. at 12-13).

On October 12, 2009, E.F.'s parents wrote a letter to Graham, as the Superintendent of the Napoleon School District that stated, in pertinent part:

> I am writing to inform the school district that my child, [E.F.], will be receiving a certified service dog in October, 2009. The dog is expected to attend school with [E.F.] starting in January, 2010. The dog will be fully trained and certified with full access rights under the federal ADA guidelines as well as under state guidelines. The dog will accompany [E.F.] everywhere she goes.
>
> I am requesting a copy of the district's Service Assistance Animal Policy be sent

to me.

I have had phone conversations about the dog with you, as well as speaking to Mrs. Barnes. I had made you all aware of this situation in March of 2009.

I would like to have a meeting as soon as possible to discuss and set up transitioning the dog into the school, training of the school team, how to prepare the other students and their families, and addressing any concerns.

We will be departing on October 13, 2009 to travel to Ohio for our training with the dog and will return on October 22, 2009 . . .

I would appreciate a response as soon as possible, since I have heard nothing back from my earlier contact requesting the Service Animal Policy.

Thank you in advance for addressing this situation.

(D.E. No. 39-5).

E.F.'s parents provided the Napoleon Community Schools with an October 30, 2009 letter from E.F.'s physician stating that E.F.'s "spastic quadriplegic cerebral palsy makes it medically necessary that she use a guide/helper dog. It will be necessary for her dog to also be allowed to assist her at school, and will be in school with her for daily activities." (D.E. No. 39-3).

Stacy Fry testified that there was a meeting at the elementary school that took place on December 11, 2009, during which they discussed the service dog. (Stacy Fry Dep. at 43-44). She further testified that a future meeting was then set for January 7, 2010.

Before that meeting was held, on December 17, 2009, E.F.'s parents sent Graham a letter that stated:

We are writing to you in regard to the meeting that was held on Friday, December 11, 2009 and the upcoming meeting that was discussed to be set for January 7, 2010. These meetings were / will be held to discuss our daughter, [E.F.'s] service dog Wonder and his attendance with her in school. As you are aware, our daughter has a medical condition that causes her to have the need and right to be accompanied by her service dog in all public buildings, including educational settings, to increase her independence and education.

Per the December 11th meeting we are requesting the concerns, questions, and exactly what will be discussed during this next meeting, set to be held on January 7th, 2010, to be sent to us in writing prior to the meeting so that we may fully prepare for the meeting and be able to answer your questions and concerns to the best of our ability. We are also, again, requesting the written policy on service animals in the school from your district.

From our understanding from the December 11th meeting some of the concerns and comments brought up by you and the administrative staff were our daughter's age, allergies and fears of dogs, if the dog would potty at school, proof of Wonder's service dog certification, and our daughter not needing the use of the service dog because she already has an aide. More specifically, I recall Mr. Rendell, from the Intermediate School District, stating that he would not continue to pay for an aide for our daughter if she had the service dog and he would not pay for the aide to handle our daughter's service dog, so we are assuming there are budgetary concerns as well.

We look forward to communicating further with you in regard to our daughter [E.F.] and her service dog Wonder. His attendance in your school is not only a physical, social, emotional, and educational benefit to [E.] but to all the students that attend Ezra Eby Elementary.

(D.E. No. 39-7). Graham testified as follows:

Q.    One outcome of that meeting was there was another meeting scheduled for January 7th. Do you know who asked for that January 7 meeting to be scheduled? Was it the Frys or was it Napoleon Community Schools?

A.    Well, any time a parent would want an accommodation, it would be the Frys. If they want that dog to come to school, that's something different than what the IEP says, then they would be asking for that accommodation, which we would need to reconvene the IEP team, which I was invited to that meeting.

Q. Okay. So just to understand the process, any time a parent asks for an accommodation for a student that has an IEP, that's automatically discussed in the context of an IEP meeting that's called at the Napoleon Community Schools. Is that right?

A. To the best of my knowledge it is.

Q. Okay. Just as a matter of process.

A. Yeah. When that IEP changes, something is brought to the table that would change the IEP process, we would have the family involved and have a team meeting, correct.

Q. Was that any type of accommodation or only accommodations that in the school's view would change the IEP process?

A. I would say any type of accommodation.

Q. Okay. So just to be clear, it's the Napoleon Community School's position that as a result of the Frys requesting an accommodation, that was the same thing as asking for an IEP to be convened.

A. Yes. When a family comes and asks us to do something different than the IEP says, to accommodate that, we would have a family team meeting. We would have a team meeting.

(Graham Dep. at 38-39).

Graham sent the Frys a letter dated January 4, 2010, in response to their December 17, 2009 letter. (D.E. No. 39-8). It stated, in pertinent part, that:

This letter is in response to your written request dated December 17, 2009. You have requested prior written notice for the IEP scheduled on January 7, 2010 for your daughter [E.F.]. You have asked that we state our concerns, questions and what will be discussed during this [IEP] meeting. As discussed at our meeting on December 11th, our district is attempting to consider your request to allow "Wonder, the service dog" to accompany [E.F.] to school. As in all previous IEP meetings, the intent of the IEP will be to consider the specific educational needs of [E.F.] and to ensure her continued success and progress while attending Eby Elementary School.

Napoleon Public Schools recognizes that under ADA (Americans with Disabilities Act), service dogs are regarded as tools to facilitate independence.

. . . .

As with any parent request, an IEP has been scheduled to consider the educational

benefit of the addition of a service dog to the current educational program for your daughter [E.F.]

We look forward to meeting with you on January 7, 2010 to discuss the best possible plan that can be provided.

(*Id*.).

Another meeting was held on January 7 2010. Stacy Fry testified as follows regarding that meeting:

Q.  During the January 7, 2010 IEP, when was the use of the dog discussed?

A.  To the best of my recollection at the very end, just very, very briefly.

Q.  You said this meeting lasted about two hours earlier in your testimony?

A.  I believe.

Q.  How long do you think that part of the conversation lasted?

A.  Maybe ten minutes.

Q.  Okay. During the time that the dog was being discussed in those ten minutes, did you explain why you felt the dog should be permitted?

A.  I did. I expressed the fact that she had the right to utilize a service dog under the Americans with Disabilities Act and that was her Civil Right. That is [sic] was an access issue for her to be able to use the dog.

Q.  How did the school respond to that when you raised that issue?

A.  I don't recall getting any response.

(Stacy Fry Dep. at 100-101).

At the conclusion of the January 7, 2010 meeting, the Frys were informed in writing that the "request of a service dog has been considered and rejected by the IEP team. It is felt by the IEP team that all of the student's physical and academic needs are being met through the services/programs/accommodations of the IEP." (D.E. No. 39-9). That same form noted that the "Parents were comfortable and agreed with the rest of the IEP as outlined." (*Id*. at Pg ID 414).

18

That form, given to the Frys on that date, had the following section to be filled out by the

parents:

ADULT PROVIDING IEP CONSENT - 1) I understand the plan contents; 2) I
have been fully informed of my procedural rights; 3) If needed, I have been given
sources to contact to obtain assistance; and : (choose all that apply)

☐      I agree with this plan.

☐      I/We elect to receive, if available, copies of selected paperwork via e-mail.

☐      I understand the contents of this initial IEP but decline special education
services for my child, including the programs and/or services offered in
this IEP and the procedural protections that come with special education
eligibility.

☐      I do not agree with this plan and request mediation.*

If a parent or public agency disagrees with this IEP, either party has the right to

request a due process hearing.

(D.E. No. 39-9 at Pg ID 415).   Graham testified:

Q.      What would have happened if the Frys just said "we're not signing this
document at all?"

A.      I don't know.

Q.      Has that ever happened?

A.      Not to my knowledge.

(Graham Dep. at 59-60).

The Frys, who were not represented by counsel, signed the form and checked the box that

said, "I do not agree with this plan and request mediation."  (*Id*.).

Stacy Fry testified that they checked that box "[b]ecause we wanted to continue the

discussion of [E.F.] being able to have her service dog accompany her to school, and this was the

only way we knew how . . . We had to check a box and we wanted to continue the conversation. And so just having the door closed on us, we always believed that it was [E.F.'s] right independent of the education plan to have the service dog with her, but this was the only means for us to continue the conversation with the school." (Fry Dep. at 72-73).

Later the same day they signed that form, January 7, 2010, the Frys sent Graham a letter that stated:

> This letter is in response to our daughter, [E.F.'s] IEP meeting that took place today. We understand that Napoleon Public School is **denying access to our daughter's use of her service dog to a public educational institution.** We are requesting that an explanation for the denial of our daughter's use of her certified mobility service dog be placed in writing. In addition, we ask that the school further explain why the addition of her service dog is an *unreasonable* accommodation.

> We understand from your previous letter that Napoleon Public School recognizes that under ADA (Americans with Disabilities Act) service animals are regarded as tools to facilitate independence. **We feel that this is more of an access issue rather than an educational one. However, since the school has been [sic] deemed it an educational issue we see your refusal to allow our daughter access to her service animal, which mitigates here disability and enhances her independence, during school and in the classroom, is in essence a denial of FAPE (Free Appropriate Public Education) in the least restrictive environment.**

> As we have also mentioned, [E.F.'s] service dog is a medically prescribed durable medical equipment that she uses to mitigate her disability. It was our hope to work in unison with the school to facilitate any accommodation and/or service necessary to successfully introduce and assist with the addition of Wonder, [E.'s] service dog, in the classroom.

> We believe that there is still opportunity to reach a reasonable compromise with this matter. Thank you for addressing this in a timely manner and feel free to contact us with any questions.

(D.E. No. 39-10) (italics in original; bolding added for emphasis).

At some point after the January 7, 2010 meeting, the ACLU began representing the Frys.

On January 21, 2010, the ACLU sent Defendants a letter, that stated in pertinent part:

> We write in support of Stacy and Brent Fry's request that their daughter [E.F.] be able to bring her service dog, Wonder, with her to school at Ezra Eby Elementary School. . . As set forth below, [E.F.] has a right under the Americans with Disabilities Act to bring Wonder to school. The Frys and the [ACLU] would like to resolve this issue amicably and quickly and request a meeting at your earliest convenience.
>
> . . . .
>
> In May 2008, [E.F.'s] pediatrician . . . wrote a prescription for a mobility assistance dog for her to promote her independence.
>
> . . . .
>
> Prior to registering E.F. for school, the Frys advised the school of their decision to purchase a service dog to assist E.F. with her everyday activities. At no point did the school district suggest that a service dog would not be permitted in the school. In fact, the Frys were led to believe that the service dog could attend school with E.F..
>
> Nonetheless, in December 2009, the Frys were informally advised that E.F. could not bring Wonder to school. The School District formalized this decision by rejecting the request to bring Wonder to school in a specially convened Individualized Education Plan (IEP) meeting on January 7, 201. The IEP confirms that the Frys "requested a service dog for their daughter to enhance her independence" and that the request was denied as E.F.'s "physical and academic needs are being met through the services/programs/accommodations of the IEP."

### E.F'S RIGHT TO A SERVICE DOG UNDER
### THE AMERICANS WITH DISABILITIES ACT

> The [ADA] provide that public entities, such as public schools, must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.
>
> . . . .
>
> There is no evidence that Wonder would in any manner interfere with the school's

activities.

. . . .

The [IDEA] addresses the educational needs of children with disabilities and requires school districts to provide special education and related services designed to meet the specific learning needs of a child with a disability. By working with the family and teachers to draft an IEP for a child with a disability, a school district sets forth how the child's academic needs will be met. Napoleon Community Schools determined at the recent IEP meeting that E.F.'s educational needs are being met, and therefore Wonder is not necessary. *We disagree. According to Dr. Nelson, Wonder is able to help E.F. increase her independence. Wonder has also helped [her] gain self-confidence. Clearly, self-confidence and independence are both necessary for educational success.*

*Nonetheless, even assuming for the sake of argument that the district was meeting E.F.'s educational needs without Wonder,* **the duty of the school to accommodate students with disabilities is independent from, and in addition to, any rights she has under the IDEA.** *E.F.'s right to utilize her service dog at school is about more than her educational goals; it is about her right to access the school using the support she needs and prefers to promote her independence.*

. . . .

A service dog is only effective when the owner and the dog can form a significant bond. This cannot be accomplished if Wonder spends more than six hours each day away from E.F.. Wonder's efficacy will be diminished if he is not permitted to attend school with E.F.. Each day that [she] is deprived of her right to bring Wonder to school her working relationship with Wonder deteriorates.

. . . .

Prohibiting E.F. from utilizing Wonder in her academic environment, which will be a daily part of her routine for the next twelve years, *violates the ADA* and frustrates her ability to become an independent member of the community.

. . . .

(D.E. No. 39-11) (bolding and italics added for emphasis).

Stacy Fry testified that the mediation consisted of a one-time meeting on January 29,

2010. (Stacy Fry Dep. at 95).[4]

On March 22, 2010, Plaintiffs and Defendants signed an "Interim Agreement." (D.E. No. 40-9). It noted that an IEP team meeting had been held on January 7, 2010 and that, at the conclusion of it, the Frys "requested mediation to address their concerns regarding the IEP Team's conclusion that the presence or use of a dog was not necessary to provide E.F. with a free appropriate public education." (*Id*. at Pg ID 580). It stated that the "Parties held a mediation session on January 29, 2010" and that they were agreeing to allow the dog access to the instructional setting at the school, while accompanied by a designated handler provided by Plaintiffs, for a trial period. The agreement notes that Defendants "recognize that it is the Parents' view that Wonder is a service animal as that term is defined by the [ADA]" but states that they "do not concede that to be the case." The agreement states that the Parties "agree that this Interim Mediation Agreement constitutes a mediation agreement pursuant to 20 U.S.C. § 1415, and as such, is enforceable under IDEA in any court of competent jurisdiction."

The evidence provided by the parties does not include any evidence as to the details of how or why the trial period with Wonder did not succeed. But it appears undisputed that it did not work out. It also appears that the Frys removed E.F. from school and began home-schooling her. But again, the parties have not provided *evidence* regarding these alleged facts. That is because Plaintiff's Statement was, in portions, based on allegations in the complaint, and Defendants responded by denying those statements without offering any evidence to show otherwise. (*See, e.g.*, Stmts. at ¶ 27-29).

_____

[4]Defendants assert, but do not provide any evidence to support, that the mediation began on January 29, 2010, and continued for "nearly two months." (Defs.' Br. at 10).

Although there is no evidence in the record on this either, it appears undisputed that Plaintiffs never filed a complaint for a due process hearing under the IDEA.

On June 24, 2010, the ACLU filed a discrimination complaint on behalf of the Frys against Defendants with the United States Department of Education, alleging "Discrimination on the basis of disability". (D.E. No. 40-10). That letter asserted that Defendants "refusal to recognize Wonder as a service dog, and permit his access in the instructional setting, is a denial of [E.F.'s] rights pursuant to the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1972." (*Id* at Pg ID 590). That same letter asserts that Wonder is a valuable tool to help [E.F.] increase her independence" and that "[s]uch independence is critical for [E.F.'s] educational success and thus a necessary component of her IEP." (*Id.* at Pg ID 591). The letter states that the Frys "request that the Department of Education – Office of Civil Rights investigate this matter and ultimately find in favor or [E.F.] and permit her to return to Ezra Eby Elementary School in September with her service dog Wonder, and that Wonder be utilized fully in assisting [E.F.] and have full access within the school setting." (*Id.*)

On or about May 3, 2012, the Office of Civil Rights ("OCR") issued a decision letter, which is attached to Plaintiff's Complaint at D.E. No. 1 at Pg ID 19. The OCR agreed with the Frys that Defendants' exclusion of E.F.'s service animal violated her rights under the ADA and Section 504 of the Rehabilitation Act. The OCR "explained in its decision letter that a school's obligations under those statutes go beyond providing educational services: A school could offer a FAPE to a child with a disability but still run afoul of the laws' ban on discrimination." *Fry*, 137 S.Ct. at 751. As the Supreme Court explained, the OCR found that:

Ezra Eby had indeed violated that ban, even if its use of a human aide satisfied the

FAPE standard. *See id.*, at 35-36. OCR analogized the school's conduct to "requir[ing] a student who uses a wheelchair to be carried" by an aide or "requir[ing] a blind student to be led [around by a] teacher" instead of permitting him to use a guide dog or cane. *Id*. at 35. Regardless whether those – or Ezra Eby's – policies denied a FAPE, they violated Title II and § 504 by discriminating against children with disabilities.

*Fry*, 137 S.Ct. at 751.

It is undisputed that in order to settle the complaint with the OCR, Defendants entered into a six-page resolution agreement in which they agreed to take E.F. back with Wonder and allow Wonder to accompany and assist E.F. throughout the school. (Pl.'s & Defs.' Stmts. at ¶ 33).

It appears undisputed, however, that E.F. did not return to school after that agreement. The Frys claim to have enrolled E.F. in another school that enthusiastically welcomed E.F. and Wonder, because, after a contentious meeting with a school official, they feared school officials might resent E.F. and make her return to school difficult. But there is no evidence in the record as to this either, as Plaintiffs' Counsel just references the complaint in support of this assertion and Defendants simply denied it as untrue.

On December 17, 2012, the Frys filed this action in federal court, asserting claims under the ADA and Section 504 of the Rehabilitation Act.

III.    **Application Of The Supreme Court's Tests To This Case**

Although the Supreme Court's decision remanded for consideration of just the final

"clue" regarding history of the proceedings, the Court addresses here all of the components of the inquiry.

### A.    Look To The Complaint Itself

Again, the Supreme Court noted that the "central inquiry" is the "plaintiff's own claims." *Fry, supra*, at 755. Thus, a "court deciding whether § 1415(l) applies must therefore examine whether a plaintiff's complaint – the principal instrument by which she describes her case – seeks relief for the denial of an appropriate education." *Id.*

As the Supreme Court noted, the Plaintiff's complaint in this case "alleges only disability-based discrimination, without making any reference to the adequacy of the special education services E.F.'s school provided." *Id*. at 758. Plaintiff's complaint "contains no allegation about the denial of a FAPE or about any deficiency in E.F.'s IEP. More, it does not accuse the school even in general terms of refusing to provide the educational instruction and services that E.F. needs." *Id*. "The Frys instead maintained, just as OCR had earlier found, that the school districts infringed E.F.'s right to equal access – even if their actions complied in full with the IDEA's requirements." *Id.*

In addition, the complaint contains factual allegations as to how the Frys ultimately chose to send E.F. to a school in another district, one that allegedly enthusiastically welcomed E.F. and Wonder. There is no indication in the complaint that the Frys ever intended to have E.F. return to Ezra Eby Elementary School. In fact, during the years during which this case has proceeded, E.F. has since finished elementary school.

Accordingly, there is nothing about the allegations in the Plaintiffs' complaint in this

action that indicate that it is actually seeking relief for the denial of a FAPE by Defendants.

**B.      Consideration Of The Pair Of Hypothetical Questions**

Consideration of the pair of hypothetical questions suggested by the majority opinion also suggests that the essence of Plaintiff's complaint is equality of access to public facilities, and not the adequacy of special education.

In a footnote addressing concerns raised in the concurring opinion, the majority opinion stated that the "point of the questions is not to show that a plaintiff faced with a particular set of circumstances could *only* have proceeded under Title II or § 504 – or, alternatively, could *only* have proceeded under the IDEA.  (Depending on the circumstances, she might well have been able to proceed under both.)  Rather, these questions help determine whether a plaintiff who has chosen to bring a claim under Title II or § 504 instead of the IDEA – and whose complaint makes no mention of a FAPE – nevertheless raises a claim whose *substance* is the denial of an appropriate education."  *Id.* at 757 n.10 (italics in original).

Consideration of the hypothetical questions here, shows that the substance of Plaintiffs' complaint asserting ADA/Section 504 claims, with no allegation of a denial of a FAPE and not seeking to modify her IEP, is not the denial of a FAPE.  As the Supreme Court noted in the majority opinion:

> Consider, as suggested above, that the Frys could have filed essentially the same complaint if a public library or theater had refused admittance to Wonder.  *See, supra*, at 756.  Or similarly, consider that an adult visitor to the school could have leveled much the same charges if prevented from entering with his service dog.  *See ibid*.  In each case, the plaintiff would challenge a public facility's policy of precluding service dogs (just as a blind person might challenge a policy of barring guide dogs, *see supra*, at 751) as violating Title II's and § 504's equal access requirements.  The suit would have nothing to do with the provision of

educational services.  From all that we know now, that is exactly the kind of action the Frys have brought.

*Fry*, 137 S.Ct. at 758-59.

This Court agrees with the Supreme Court that consideration of the pair of hypothetical questions also indicates that the Plaintiffs' Complaint is not seeking relief for the denial of a FAPE.

## C.      Consideration Of The History Of Proceedings

Consideration of the history of the proceedings, therefore, is the only "clue" that could possibly suggest that the gravamen of the Plaintiffs' complaint is actually the denial of a FAPE. *See Fry*, 137 S.Ct. at 758 ("From all that we know now," this suit has nothing to do with the provision of educational services "[b]ut we do not foreclose the possibility that the history of these proceedings might suggest something different.").

In this Court's view, both Plaintiffs' and Defendants' briefs miss the mark in terms of analyzing this issue upon remand.

Plaintiffs contend that their involvement in the IDEA procedures does not indicate that this action is about a denial of FAPE for three reasons: 1) because the Frys did not decide to invoke the IDEA's procedures, Defendants did; 2) because the Frys testified they only participated in IDEA mediation because they thought it was the only way they could continue the conversation about the service dog; and 3) because other courts have found exhaustion not required, even though the plaintiffs had participated in some IDEA procedures.  Thus, Plaintiffs give us evidence as to why Plaintiffs "started down the IDEA road," but offer no evidence as to

why Plaintiffs *changed course*.

Defendants continue to make the same kind of arguments that they made before the Sixth Circuit, that exhaustion is required because the Frys made many statements indicating that E.F.'s use of the dog was needed to develop "independence" and, since that is the goal of her IEP, exhaustion is required.

Notably, neither party has offered this Court any evidence as to the reasons behind the Frys change from participating in the IDEA's administrative procedures to their decision to pursue federal court litigation based on the ADA and Section 504 of the Rehabilitation Act alone. (*See* 8/16/18 Hrg. Tr.) (when asked by the Court if counsel for either party ever asked the Frys during their depositions why they changed course and decided to bring suit under the ADA/Section 504 alone, counsel responded "no.")

In discussing the consideration of the history of proceedings issue, the majority opinion stated that a "court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute – thus starting to exhaust the Act's remedies before switching midstream and explained:

> Recall that a parent dissatisfied with her child's education initiates those administrative procedures by filing a complaint, which triggers a preliminary meetings (or possibly mediation) and then a due process hearing. *See, supra*, at 748-749. A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE – with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of a such a remedy.

*Fry,* 137 S.Ct. at 757. The majority noted that "whether that is so depends on the facts" at hand in each case. And it gave an example of circumstances under which the shift to judicial

proceedings would not be indicative of a strategic calculation about how to maximize the prospect of a remedy for the denial of a FAPE – a court may conclude "that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely." *Fry,* 137 S.Ct. at 757.

The concurring opinion gave three other examples of circumstances that would not be indicative of a strategic calculation about how to maximize the prospect of a remedy for the denial of a FAPE:  1) "circumstances under which parents might start down the IDEA road and then change course and file an action under the ADA or the Rehabilitation Act that seeks relief that the IDEA cannot provide;" or 2) circumstances under which the "parents might be advised by their attorney that the relief they were seeking under the IDEA is not available under that law but is available under another; or 3) "the parents might change their mind about the relief that they want, give up on the relief that the IDEA can provide, and turn to another statute." *Fry,* 137 S.Ct. at 759.

Here, however, the parties have not provide any evidence as to the reasons why the Frys changed course (i.e., why they stopped pursuing administrative relief under the IDEA and, instead, filed suit in federal court under the ADA/Rehabilitation Act alone).  In other words, there is no evidence in the record as to the reasons behind their shift to judicial proceedings. Absent such evidence, in light of the Supreme Court's instructions upon remand, and mindful of the factual gaps in the proceedings discussed earlier, the Court concludes that a summary judgment ruling is not appropriate at this time.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that both motions for summary

judgment on the affirmative defense of failure to exhaust remedies are DENIED WITHOUT

PREJUDICE.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: August 23, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 23, 2018, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager