UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

E.F., a minor, by her next friends,
Stacy Fry and Brent Fry,

     Plaintiff,

v.                                  Case No. 12-15507

Napoleon Community Schools, *et al.*,       Sean F. Cox
                                       United States District Court Judge

     Defendants.

_____/

**OPINION & ORDER
DENYING SUMMARY JUDGMENT MOTIONS**

Plaintiff filed this action against Defendants alleging they violated the Americans with

Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") by refusing

to allow her, a minor[1] student referred to herein as "E.F.," to bring her service dog to school with

her. Discovery in this longstanding action has closed and both parties filed summary judgment

motions, which were heard by the Court on August 29, 2019. Plaintiff's summary judgment

motion asks the Court to rule in her favor as to liability on her intentional discrimination claim,

and then schedule a jury trial to determine damages. Defendants filed a summary judgment

motion that asks the Court to rule in their favor and dismiss this case. For the reasons set forth

below, the Court concludes that neither party is entitled to summary judgment and that Plaintiff's

ADA and Section 504 claims shall proceed to a jury trial.

_____

       [1]The "child" in this action was five years old, and just entering kindergarten, when this
dispute began. She is now fifteen years old.

**BACKGROUND**

**A.     Procedural Background**

On December 17, 2012, Plaintiff E.F., a minor, by her next friends, Stacy Fry and Brent Fry ("Plaintiff"), filed this action against Defendants: 1) Napoleon Community Schools; 2) Jackson County Intermediate School District; and 3) Pamela Barnes.  The action was assigned to the Honorable Lawrence Zatkoff.

The only claim asserted against Barnes was the third count, brought under Michigan's Persons with Disabilities Civil Rights Act, but that state-law claim was dismissed without prejudice when Judge Zatkoff declined to exercise supplemental jurisdiction over it.   As such, the only remaining Defendants are Napoleon Community Schools and the Jackson Intermediate School District (hereinafter "Defendants").

Plaintiff asserts claims against Defendants under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and Title II of the ADA.  Plaintiff claims that Defendants violated both Section 504 and Title II of the ADA by refusing to allow E.F. to bring her service dog to school with her.

The Complaint alleges that Defendants violated the Rehabilitation Act by "denying [E.F.] equal access" to Ezra Eby Elementary School and limiting her access to the District's and ISD's facilities, programs, and services compared to her non-disabled, non-service animal user peers. (ECF No. 1 at ¶ 68).  It alleges that Defendants' "discrimination was intentional as Defendants "knowingly refused to recognize Wonder as a service dog despite having full knowledge that [E.F.] qualified as an individual with disabilities and relied upon Wonder to obtain equal access to the District's and ISD's facilities, programs, and services as compared to her non-disabled,

2

non-service animal user peers." (*Id*. at ¶ 70).

The Complaint alleges that Defendants violated the ADA by their "deliberate refusal to recognize Wonder as a service dog and to permit his access in the instructional setting, discriminated against [E.F.] as a person with disabilities who uses a service animal by denying her equal access and otherwise limiting her access to the District's and ISD's facilities, programs, and services as compared to her non-disabled, non-service animal user peers." (*Id*. at ¶ 82). It alleges that Defendants "illegally discriminated against [E.F.] in their continuing refusal to reasonably accommodate [E.F.] as a person with disabilities who uses a service animal." (*Id*. at ¶ 83).

Plaintiff's Complaint seeks a declaration that Defendants violated Plaintiff's rights under Section 504 of the Rehabilitation Act and Title II of the ADA, an award of monetary damages, and an award of attorney fees. (ECF No. 1 at Pg ID 16).

Defendants filed an Answer and Affirmative Defenses on February 11, 2013 (ECF No. 11) and it included the following as an affirmative defense: "Plaintiffs have failed to exhaust their administrative remedies generally and specifically with the Individuals With Disabilities Education Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act." (*Id.* at Pg ID 73).

In January of 2014, Judge Zatkoff dismissed this case, concluding that Plaintiff was required to exhaust administrative remedies under the Individuals with Disabilities Education Act (the "IDEA"). The Sixth Circuit agreed with Judge Zatkoff and affirmed his dismissal. The Supreme Court, however, granted certiorari to address confusion as to the IDEA's exhaustion requirement, vacated the Sixth Circuit's opinion, and remanded the matter for consideration of

the analysis set forth in *Fry v. Napoleon Commty. Sch.*, __ U.S. __, 137 S.Ct. 743, 197 L.Ed.2d 46 (2017). After the case was remanded to district court, it was reassigned from Judge Zatkoff to the undersigned.

Following remand, the parties conducted discovery related to administrative remedies pursued and filed summary judgment motions on Defendants' affirmative defense. On March 1, 2019, this Court issued an "Opinion & Order Granting Plaintiff's Partial Summary Judgment Motion And Striking Affirmative Defense Of Failure To Exhaust Administrative Remedies Under The IDEA." (ECF No. 66).

Discovery in this case has now closed and both parties filed dispositive motions. Plaintiff filed a summary judgment motion that asks the Court to rule in her favor as to liability on her intentional discrimination claim, and then schedule a jury trial to determine damages. Defendants filed a summary judgment motion that asks the Court to rule in their favor and dismiss this case.

**B.      Relevant Factual Background**

E.F. is a minor child with a severe form of cerebral palsy and she is qualified for special education services.

Before enrolling her in the Ezra Eby Elementary School's kindergarten program for the 2009-2010 school year, E.F.'s parents informed the school administration that they planned to obtain a service dog for E.F. and expected the animal to attend school with her. Jim Graham, the Superintendent of the Napoleon Community School District, testified that E.F.'s mother informed him of this during some type of program at the school. (Graham Dep. at 12-13). He testified that he walked away without saying anything in response. (*Id.*).

4

Pamela Barnes, the Principal of Ezra Eby Elementary School, testified that she knew that the Frys were in the process of obtaining a service dog for E.F. at the beginning of the school year. (*Id*. at 24).

On October 12, 2009, E.F.'s parents wrote a letter to Superintendent Graham, which stated, in pertinent part:

> I am writing to inform the school district that my child, [E.F.], will be receiving a certified service dog in October, 2009. The dog is expected to attend school with [E.F.] starting in January, 2010. The dog will be fully trained and certified with full access rights under the federal ADA guidelines as well as under state guidelines. The dog will accompany [E.F.] everywhere she goes.
>
> I am requesting a copy of the district's Service Assistance Animal Policy be sent to me.
>
> I have had phone conversations about the dog with you, as well as speaking to Mrs. Barnes. I had made you all aware of this situation in March of 2009.
>
> I would like to have a meeting as soon as possible to discuss and set up transitioning the dog into the school, training of the school team, how to prepare the other students and their families, and addressing any concerns.
>
> We will be departing on October 13, 2009 to travel to Ohio for our training with the dog and will return on October 22, 2009 ...
>
> I would appreciate a response as soon as possible, since I have heard nothing back from my earlier contact requesting the Service Animal Policy.
>
> Thank you in advance for addressing this situation.

(ECF No. 80-9).

Principal Barnes testified as follows regarding her research on the issue of service animals being used in the school:

> Q.     After you were told by the Frys that they were bringing a service animal home for [E.F.] that they intended to use at the schools, did you do anything to determine what the school's obligations would be to a student with a service animal?
>
> A.     What do you mean obligations?

Q.    Your legal obligation under federal or state law.
. . . .
A.    Well, at that time there wasn't a service law – service dog law for schools.
Q.    How did you come to that conclusion?
A.    Because I researched it myself.
Q.    How did you research it?
A.    On the internet.
Q.    So you Googled it?
A.    Yeah.  You know, there wasn't a law at that time . . .
Q.    Aside from doing an internet search, did the Napoleon Community Schools consult with counsel in 2009 regarding its obligations under federal or state law to allow a service animal, to your knowledge?
A.    No. Not to my knowledge.

(Barnes Dep. at 32-33).

The service dog that the Frys obtained for E.F. was a goldendoodle named "Wonder," who received his certification as a task-trained service animal by an organization in Xenia, Ohio called 4 Paws for Ability.  (ECF No. 80-5). Stacy Fry, E.F.'s mother, also received training there. (ECF No. 80-8).

Plaintiff contends that Wonder was trained to understand 29 different commands, and was able to accomplish tasks to assist E.F., including retrieval of dropped items, balancing and mobility assistance, toileting assistance, opening and closing doors, removing E.F.'s jacket, turning on and off lights, barking to alert an adult when commanded, retrieving an adult when commanded, and supporting E.F. when she is seated on the floor.  (ECF No. 80-7).  Defendants dispute that Wonder was able to perform all of those tasks.

E.F.'s parents provided the Napoleon Community Schools with an October 30, 2009 letter from E.F.'s physician, Dr. Virginia Nelson, M.D., M.P.H., the Chief of Pediatric and Adolescent Services at the University of Michigan Health System.  (ECF No. 80-2).  In that letter, Dr. Nelson advised Defendants that E.F.'s "spastic quadriplegic cerebral palsy makes it

medically necessary that she use a guide/helper dog. It will be necessary for her dog to also be allowed to assist her at school, and will be in school with her for daily activities." (ECF No. 80-2).

Stacy Fry testified that, after they returned home with the service dog, E.F. was really excited to bring Wonder to school with her. (Stacy Fry Dep. at 56-57). Stacy testified that she first brought Wonder to school with E.F. on a Friday, walking him in with E.F. in the morning, and then bringing him back with her when she picked E.F. up at the end of the day. (*Id*.). The following Monday, however, she was told by Barnes to leave the dog at home. (*Id*.). This was during October of 2009. (*Id*.).

It is undisputed that Defendants provided E.F. with a human aide, to accompany her at all times during school hours, and access to a walker and a wheelchair. With that human aide and the walker/wheelchair, E.F. could access the various areas of the school, such as the class room, the media center, the computer lab, and the cafeteria. (Stacy Fry Dep. at 35-36 & 48; Brent Fry Dep. at 14-15).

Between October of 2009 and April of 2010, Wonder was allowed in the foyer and hallway area of the school, when Mrs. Fry dropped off or picked up E.F. (Barnes Dep. at 30-32). During that time period, the school did not permit Wonder to accompany E.F. in any classrooms, the media center, the cafeteria, or at recess. (Barnes Dep. at 126-127).

A meeting was held on December 11, 2009, between the Frys and the school administrators during which the service dog was discussed, and a future meeting was then set for January 7, 2010. (Stacy Fry Dep. at 43-44). Stacy testified that during the December 11, 2009 meeting, Richard Rendell (the head of the Jackson County Intermediate School District) stated

that the school would not provide a human aide if E.F. had the service dog at school.  (*Id*. at 71).

Barnes testified that she does not recall Mr. Rendell saying that.  (Barnes Dep. at 51-52).

Barnes testified that, as to E.F. being accompanied to school with Wonder, she had concerns regarding: 1) children having dog phobias; and 2) other students being distracted by a dog in the classroom.  (Barnes Dep. at 53-56).  Barnes testified those were the main concerns. (*Id*.).

Graham states that "[w]hen parents in the district found out about Wonder, some parents raised concerns about Wonder's presence at school.  Some parents were concerned because their children were very afraid of dogs due to past dog attacks.  Some parents raised concerns about allergies, and other parents raised concerns that Wonder would cause a distraction for their children."  (Graham Decl. at ¶ 3).

Before the next meeting, the Frys sent Superintendent Graham a letter dated December 17, 2019, that was copied to Barnes, that stated:

> We are writing to you in regard to the meeting that was held on Friday, December 11, 2009 and the upcoming meeting that was discussed to be set for January 7, 2010.  These meetings were/will be held to discuss our daughter, [E.F.'s] service dog Wonder and his attendance with her in school.  As you are aware, our daughter has a medical condition that causes her to have the need and right to be accompanied by her service dog in all public buildings, including educational settings, to increase her independence and education.
>
> Per the December 11th meeting we are requesting the concerns, questions, and exactly what will be discussed during this next meeting, set to be held on January 7th, 2010, to be sent to us in writing prior to the meeting so that we may fully prepare for the meeting and be able to answer your questions and concerns to the best of our ability. We are also, again, requesting the written policy on service animals[2] in the school from your district.

---

[2]The school district had a policy related to "guide dogs," that was produced during discovery in this case.  It stated:

From our understanding from the December 11th meeting some of the concerns and comments brought up by you and the administrative staff were our daughter's age, allergies and fears of dogs, if the dog would potty at school, proof of Wonder's service dog certification, and our daughter not needing the use of the service dog because she already has an aide.  More specifically, I recall Mr. Rendell, from the Intermediate School District, stating that he would not continue to pay for an aide for our daughter if she had the service dog and he would not pay for the aide to handle our daughter's service dog, so we are assuming there are budgetary concerns as well.

We look forward to communicating further with you in regard to our daughter [E.F.] and her service dog Wonder.  His attendance in your school is not only a physical, social, emotional, and educational benefit to [E.F.] but to all the students that attend Ezra Eby Elementary.

Thank you for your time,

Brent and Stacy Fry

(ECF No. 80-13).

E.F.'s physician, Dr. Nelson, provided Defendants with a letter dated December 31, 2009,

that stated:

[E.F.] is a 5-1/2-year-old girl with cerebral palsy.  To increase her independence, she now has a service dog which assists her in some of her activities.  The dog is not able to assist her in all ways she needs assistance (eg. toileting, assistance at meal times, etc.) and thus she continues to need a paraprofessional to help her, too.

I urge you to allow [E.F.'s] service dog to take part in the school program with her.  Other school districts readily permit service dogs to be part of their owners' school days.

Guide dogs for students who require this type of assistance shall be permitted access to all facilities, programs, and events of the District.  The student must provide evidence of the dog's certification for that purpose.  If the dog is still in training, proof of liability insurance policy must be provided.

(ECF No. 80-10).

If you have any questions or concerns please feel free to contact me . . .

(ECF No. 81-13).

In a letter dated January 4, 2010, Graham responded to the Frys' December 17, 2009

letter. (ECF No. 80-14). In his letter, Graham stated the "district is attempting to consider your

request to allow 'Wonder, the service dog' to accompany [E.F.] to school." It further stated, in

pertinent part:

> Napoleon Public Schools recognizes that under ADA (Americans with
> Disabilities Act), service dogs are regarded as tools to facilitate independence.
> We understand that there are circumstances where service dogs provide benefit to
> the lives of their handler. Specifically, with regard to your request, Napoleon
> Schools will need to consider the following points on behalf of [E.F.] and all
> students:
>
> - What disability related educational need is the dog intended to address?
>
> - With consideration of the current educational plan for [E.F.] including an
> individual aide, will access to the service dog enhance or hinder her ability to
> progress in the general kindergarten curriculum.
>
> - Is [E.F.] currently capable of being responsible for the dog?
>
> - Given the age and maturity level of the kindergarten classroom, can the
> distraction created in the room be accommodated without compromising the
> learning environment?
>
> . . . .
> We look forward to meeting with you on January 7, 2010 to discuss the best
> possible plan that can be provided.

(*Id.*).

Another meeting was held on January 7, 2010. Stacy Fry testified as follows regarding

that meeting:

> Q.     During the January 7, 2010 IEP, when was the use of the dog discussed?
> A.     To the best of my recollection at the very end, just very, very briefly.

10

Q. You said this meeting lasted about two hours earlier your testimony?

A. I believe.

Q. How long do you think that part of the conversation lasted?

A. Maybe ten minutes.

Q. Okay. During the time that the dog was being discussed in those ten minutes, did you explain why you felt the dog should be permitted?

A. I did. I expressed the fact that she had the right to utilize a service dog under the Americans with Disabilities Act and that was her Civil Right. That is [sic] was an access issue for her to be able to use the dog.

Q. How did the school respond to that when you raised that issue?

A. I don't recall getting any response.

(Stacy Fry Dep. at 100-101).

Barnes testified that the January 7, 2010 meeting lasted about an hour and that no more than five minutes was spent discussing the dog. (Barnes Dep. at 64-65).

At the end of the January 7, 2010 meeting, the Frys were informed in writing that the "request of a service dog has been considered and rejected by the IEP team. It is felt by the IEP team that all of the student's physical and academic needs are being met through the services/programs/accommodations of the IEP." (ECF No. 54-8).

Later that same day, January 7, 2010, the Frys sent Graham a letter that stated, in pertinent part:

This letter is in response to our daughter, [E.F.'s] IEP meeting that took place today. We understand that Napoleon Public School is denying access to our daughter's use of her service dog to a public educational institution. We are requesting that an explanation for the denial of our daughter's use of her certified mobility service dog be placed in writing. In addition, we ask that the school further explain why the addition of her service dog is an *unreasonable* accommodation.

We understand from your previous letter that Napoleon Public School recognizes that under ADA (Americans with Disabilities Act) service animals are regarded as tools to facilitate independence . . .

As we have also mentioned, [E.F.'s] service dog is a medically prescribed durable

medical equipment that she uses to mitigate her disability. It was our hope to work in unison with the school to facilitate any accommodation and/or service necessary to successfully introduce and assist with the addition of Wonder, [E.F.'s] service dog, in the classroom.

We believe that there is still opportunity to reach a reasonable compromise with this matter. Thank you for addressing this in a timely manner and feel free to contact us with any questions.

(ECF No. 54-9) (italics in original).

At some point in January of 2010, the American Civil Liberties Union ("ACLU") began representing the Frys. On January 21, 2010, the ACLU sent Defendants a letter, asserting that Defendants were violating E.F.'s rights under the ADA by not allowing Wonder to accompany her at school. (ECF No. 54-10)

After a mediation, on March 19, 2010, the Frys and Defendants entered into a written "Interim Agreement" (ECF No. 80-18) wherein the District agreed to allow Wonder access to the instructional setting at the School, while accompanied by a designated handler provided by the Frys, for a trial period. It further provided that "[b]efore the dog is permitted in the instructional environment, the District will be given ten calendar days to provide written notice to the staff and the parents of the other students within the instructional setting of the pending trial period." (*Id.*)

On March 23, 2010, Barnes sent a letter to the parents of the students in E.F.'s class, advising that there would be a dog in the classroom during instructional hours to assist a student. Defendants state that, in response to that letter, they received complaints and concerns from some parents of students. (ECF No. 81-30).

It is undisputed that Wonder was allowed to attend School with E.F. for a trial period after the Interim Agreement was reached.

Graham states that, after the trial period, "[m]ultiple parents again raised concerns" "about Wonder being present in the school. One parent even sent photographs from wounds her child sustained in a particularly vicious dog attack." (Graham Affidavit at ¶ 8).

Barnes testified that there was never a time when Wonder was out of control while at the school. (Barnes Dep. at 179). She further testified that, to her knowledge, the Napoleon Community Schools never concluded that Wonder's presence in the instructional setting created a significant risk to the health and safety of others. (*Id.*).

The Frys were not satisfied with the way the trial period went. They believed that the School refused to let Wonder perform various tasks he was trained to assist E.F. with and excluded E.F. and Wonder from some in-school and extracurricular activities. (Stacy Fry Decl., ECF No. 80-21).

At the end of the trial period, in approximately May of 2010, the Frys removed E.F. from Ezra Eby Elementary and began home-schooling her. Stacy Fry's Declaration states that "[a]t the end of the trial period, in approximately May of 2010, my family and our attorneys had several meetings with the school administration to discuss the results of the trial period. The school district's administration was contemptuous throughout that meeting and informed us that, in its opinion, having Wonder at the school was not working out, and the animal would not be permitted to return to Ezra Eby in the fall." (Stacy Fry Decl. at ¶ 3).

Graham states that "Stacy Fry's claim that we told them that Wonder was not allowed back at school the next year is false. On multiple occasions, we invited them to meet with us to discuss how Wonder would be used the next school year. They refused our offers." (Graham Affidavit at ¶ 9).

13

On June 24, 2010, the ACLU filed a discrimination complaint on behalf of the Frys against Defendants with the United States Department of Education – Office of Civil Rights ("OCR"), alleging discrimination on the basis of disability, in violation of the ADA and Section 504.

During the OCR investigation, which lasted nearly two years, the Frys continued to home-school E.F. (Stacy Fry Decl. at ¶ 5).

On or about May 3, 2012, the OCR issued a decision letter, finding that Defendants had violated E.F.'s rights under the ADA and Section 504. (ECF No. 54-11).

In order to settle the complaint with the OCR, on April 26, 2012, Defendants entered into a resolution agreement in which they agreed they would invite E.F. to return to Ezra Eby Elementary School "and notify her that, should she return, she will be provided the opportunity to have a service animal accompany and assist her throughout the school day . . ." (ECF No. 54-13).

The Frys did not, however, have E.F. return to the Ezra Eby Elementary School after that resolution agreement.

Defendants maintain they offered to have E.F. attend school with the dog "until well into 2012. Although at that time we offered to let [E.F.] attend our schools with Wonder without restriction, the Frys refused." (Graham Affidavit at ¶ 10).

Stacy Fry's Declaration states: "[f]ollowing the OCR settlement, we had another uncomfortable and contemptuous meeting with the school. During that meeting, the school informed us that, pursuant to the OCR settlement, it would allow [E.F.] and Wonder to attend Ezra Eby Elementary School in the fall of 2012. However, the school continued to refuse to

acknowledge Wonder as a service animal.  The school district's attitude during this meeting made it clear to us that the school had no intention of creating a positive and healthy learning environment for [E.F.] and Wonder, even after the OCR ruling.  As a result, rather than expose [E.F.] to this negative environment, we chose to enroll our daughter in a different school district which welcomed Wonder into the school with open arms."  (Stacy Fry Decl. at ¶ 8).

## ANALYSIS

Plaintiff brings her claims against the remaining[3] two Defendants in this action under Title II of the ADA and Section 504.

"Section 504 of the Rehabilitation Act parallels the command of the ADA concerning accessibility to public facilities for persons with disabilities, but it applies only to 'any program or activity receiving Federal financial assistance.'" *Mote v. City of Chelsea*, 284 F.Supp.3d 863, 874 (E.D. Mich. 2018) (citations omitted).  There is no dispute that Defendants receive federal funds and, as a result, Section 504 applies.   The two statutes are quite similar in purpose and scope, such that the analysis of a title II ADA claim roughly parallels one brought under Section 504 of the Rehabilitation Act. *Tri-Cities Holdings, LLC v. Tennessee Admin. Procedures Div.*, 726 F. App'x. 298, 307 (6th Cir. 2018).  As a result, the pending motions focus on the ADA.

## I.     Differences Between Titles II And III Of The ADA

The ADA includes Title I, Title II, and Title III.  Through section 204 of the ADA, Congress granted to the Attorney General the "authority to promulgate regulations to implement

---

[3]Defendants' motion asserts that Defendant Barnes is entitled to qualified immunity as to claims asserted against her.  After the case was assigned to him, Judge Zatkoff declined to exercise supplemental jurisdiction over Plaintiff's state-law claim, the only claim asserted against Barnes, and dismissed that count without prejudice.  (*See* ECF No. 10).  As such, Barnes is no longer a Defendant in this case.

its provisions." *Ability Center of Greater Toledo, v. City of Sandusky*, 385 F.3d 901, 904 (6th Cir. 2004); 42 U.S.C. § 12134.

Title I of the ADA prohibits disability discrimination in employment. 42 U.S.C. § 12112(a).

Title III of the ADA "prohibits discrimination on the basis of disability in public accommodations operated by *private* entities." *Sandison v. Michigan High Sch. Athl. Ass'n, Inc.,* 64 F.3d 1026, 1036 (6th Cir. 1995) (emphasis added). A private plaintiff suing under Title III of the ADA can obtain injunctive relief, but not compensatory damages. 42 U.S.C. § 12188; 28 C.F.R. 36.504. "Public school grounds" such as the public elementary school at issue in this case, "are of course operated by public entities" and therefore Title III does not apply to them. *Sandison*, 64 F.3d at 1036. There is no claim in this action under Title III of the ADA.

Rather, Plaintiff's ADA claim is brought under Title II. "Title II of the ADA mandates that, 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a *public* entity, or be subjected to discrimination by any such entity.'" *Johnson v. City of Saline,* 151 F.2d 564, 569 (6th Cir. 1998) (quoting 42 U.S.C. § 12132) (emphasis added).

## II.    ADA Service Animal Regulations

"A year after the ADA's enactment, the DOJ, its administering agency, promulgated a regulation that made accommodation of the use of service animals generally reasonable under the 'reasonable modification' requirement. See 56 Fed. Reg. 35,544, 35,565 (July 26, 1991)." *Berardelli v. Allied Svs. Inst. of Rehab. Med.*, 900 F.3d 104, 118 (3rd Cir. 2018). That "regulation, which applied only to public accommodations under Title III, imported the

'reasonable modifications' language from the text of the ADA, see 42 U.S.C. § 12182(b)(2)(A)(jj), and further provided that public accommodations 'generally . . . shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability,' 28 C.F.R. § 36.302(c)(1) (1992)." *Id*. at 120.

"Two decades later, the DOJ spoke to the subject again." *Berardelli, supra*, at 120. "Recognizing that 'there [was] no specific language in the 1991 title II regulation [applicable to public entities] concerning service animals,' 75 Fed. Reg. 56,164, 56,191 (Sept. 15, 2010), the DOJ promulgated a regulation for that context, using materially identical language to provide that a public entity '[g]enerally . . . shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability,' 28 C.F.R. § 35.136(a)." *Id.*

It is undisputed that the Title II regulations regarding service animals did not become effective until March 15, 2011. (*See* C.F.R. 35.136; Pl.'s Br., ECF No. 80, at 14-15).

These service animal implementing regulations make it easier for a disabled individual to prevail on an ADA failure-to-accommodate claim. Indeed, the Third Circuit has stated that where none of the delineated exceptions apply, "a disabled individual's proposed accommodation of the use of her service animal is reasonable under the ADA as a matter of law." *Berardelli,* 900 F.3d at 119.

The time period during which E.F. attended Ezra Eby Elementary School but was not given full access with Wonder occurred *after* the DOJ had issued the service animal implementing regulation for Title III (governing private entities) but *before* the service animal implementing regulation for Title II (governing public entities like Defendants) were issued or became effective.

### III. Types Of ADA Claims

The Sixth Circuit has explained that "most of the law that has been made in ADA cases has arisen in the context of employment discrimination claims," not claims by students under Title II. *McPherson v. Michigan High Sch. Athl. Ass'n Inc.*, 119 F.3d 453, 460 (6th Cir. 1997). Employment cases brought under Title I of the ADA recognize several distinct kinds of claims, including: 1) intentional discrimination claims; and 2) failure-to-accommodate claims.[4]

The case law reflects that, over the years, it has been an open question as to whether a reasonable-accommodation claim under Title II is a viable claim separate and distinct from an intentional discrimination claim. *See, e.g., Everson v. Leis*, 412 F. App'x 771, 783 n.6 (6th Cir. 2011) ("This court has not explicitly decided whether a reasonable-accommodation claim under Title II is a viable claim separate from a disparate-treatment or disparate-impact type claim."). Other circuits, however, have held that claims for reasonable accommodations under Title II are separate and distinct from such intentional discrimination claims. *See, e.g.. Wisconsin Commty. Svs., Inc. v. City of Milwaukee* 465 F.3d 737, 751 (7th Cir. 2006) (en banc) (Failure to accommodate is an independent basis for liability under the ADA); *Muhammad v. Court of Common Pleas of Allegheny Cty.*, 483 F. App'x 759, 763 (3rd Cir. 2012) (A "plaintiff can assert

---

[4]In order to establish a prima facie case for failure to accommodate in an employment case under Title I of the ADA, a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011). "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Id*. at 983.

a failure to accommodate as an independent basis for liability under the ADA and RA.");

*Henrietta D. v. Bloomberg,* 331 F.3d 261, 275 (2d Cir. 2003).

Moreover, at least two Sixth Circuit cases appear to indicate that a failure-to-accommodate claim can be asserted as a separate and distinct claim from an intentional discrimination claim. *See Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004) ("Title II does more than prohibit public entities from intentionally discriminating against disabled individuals. It also requires that public entities make reasonable accommodations for disabled individuals so as to not deprive them of meaningful access to the benefits of the services such entities provide."); *Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015) (Service animal case wherein the Sixth Circuit separately addressed an ADA claim for reasonable modification of the defendant city's policies to permit the plaintiff to keep the service animal and a separate and distinct intentional discrimination claim under Title II of the ADA).

As this Court reads Plaintiff's Complaint in this case, Plaintiff alleges *both* an intentional discrimination claim and a separate failure-to-accommodate claim.

A.     **Intentional Discrimination Claims Under The ADA**

"An ADA plaintiff may show discrimination through direct or indirect evidence."

*Rosebrough v. Buckeye Valley High Sch.*, 582 F. App'x 647, 650 (6th Cir. 2014).

In this case, Plaintiff has not produced any direct evidence[5] to support her discrimination

_____

[5]Direct evidence is evidence, which believed, does not require any inferences to conclude that unlawful discrimination motivated the action or decision. While Plaintiff's summary judgment motion did not assert that Plaintiff has direct evidence of discrimination, at the hearing, Plaintiff's Counsel asserted that the School's guide dog policy constitutes "direct evidence" that entitles Plaintiff to summary judgment in her favor. That argument was not made in Plaintiff's brief and, in any event, the policy does not constitute direct evidence of disability discrimination. That is because the policy does not show – without inferences – that unlawful discrimination

claim. Thus, Plaintiff's intentional discrimination claim under the ADA in this case "follow[s] 'the familiar burden-shifting analysis" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Tri-Cities Holdings LLC v. Tennessee Admin. Procedures Div.*, 726 F. App'x 298, 308 (6th Cir. 2018) (citing *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015)).

### 1. Prima Facie Case

First, "[t]o establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Anderson*, 798 F.3d at 357. In other words, the plaintiff must show that she was subjected to discrimination "because of" the plaintiff's disability. *Id.* "Further, the plaintiff must show that the discrimination was *intentionally* directed toward him or her in particular." *Id.* (emphasis in original).

The Sixth Circuit has explained that "most of the law that has been made in ADA cases has arisen in the context of employment discrimination claims," not claims by students. *McPherson,*119 F.3d at 460. Nevertheless, there is "no doubt that the decisional principles of ADA employment cases may be applied to Title II ADA claims brought by students. *Id.* In *McPherson*, the Sixth Circuit explained as follows as to the third element:

> Applying these principles to this case, there are two methods that would allow the plaintiff to demonstrate that the [defendant school district's] actions were taken *because of* his disability: either (1) by offering evidence that learning disabilities were actually considered by [the defendant] in formulated or implementing the eight-semester rule [at issue in that case], or (2) by showing that the [defendant] could have reasonably accommodated his disability, but refused to do so.

---

motivated Defendants' decision regarding Plaintiff's request.

*McPherson*, 119 F.3d at 460 (emphasis in original). It also suggested a third method, by reliance on a disparate impact theory. *Id*. Thus, the Sixth Circuit outlined in *McPherson* "the various methods of proof in § 504 Rehabilitation Act or Title II ADA claims: discrimination under both acts may be established by evidence that (1) the defendant intentionally acted on the basis of disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionately impacts disabled people." *Washington v. Indiana High Sch. Athl. Ass'n, Inc*., 181 F.3d 840, 847 (7th Cir. 1999).

In *McPherson*, the plaintiff attempted to establish the third element by showing that the defendant could have reasonably accommodated his disability, but refused to do so. *McPherson, supra,* at 461 (The plaintiff's discrimination claim depends "upon a showing that the [defendant] could have reasonably accommodated him and refused to do so."). Thus, the Sixth Circuit had to determine whether requiring the defendant to grant the requested accommodation would "impose [ ] undue financial and administrative burdens . . . , or require [ ] a fundamental alteration in the nature of [the] program." *Id.* (quoting *Sandison, supra*, at 1034). The Sixth Circuit ultimately concluded, in *McPherson*, that the plaintiff's discrimination claim failed because his requested accommodation would have required defendant to "take on an immense administrative burden" and therefore was not reasonable.

## 2. Pretext

Once a plaintiff has established a prima facie case of discrimination, the analysis moves on to the second step. "[O]nce a plaintiff established a prima facie case of discrimination, the defendant 'must then offer a legitimate, nondiscriminatory reason for its' challenged action." *Anderson*, 798 F.3d at 357. "If [the defendant] does so – and its burden is merely one of

production, not persuasion – [the plaintiff] must then present evidence allowing a jury to find that the [defendant's] explanation is a pretext for unlawful discrimination.'" *Anderson*, 798 F.3d at 357; *see also Tri-Cities Holdings*, 726 F. App'x at 308.

**B.    Failure-To-Accommodate Claim Under The ADA**

"The ADA prohibits public entities from discriminating against individuals with disabilities, including by:

> fail[ing] to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

*Anderson,* 798 F.3d at 354 (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

In *Anderson,* the plaintiff claimed that the defendant city failed to reasonably accommodate her request to keep a miniature horse, that her daughter used as a service animal, in her backyard. After noting the above general provision, the Sixth Circuit then proceeded to analyze the plaintiff's failure-to-accommodate claim by considering the specific implementing regulations pertaining to miniature horses – that apply to public entities – and the assessment factors set forth in them:

> Regulations implementing the ADA require a public entity to make "reasonable modifications in policies, practices, or procedures to permit the use of a miniature horse by an individual with a disability if the miniature horse has been individually trained to do work or perform tasks for the benefit of the individual with a disability," provided that the horse and the requested modification also satisfy certain "[a]ssessment factors." 28 C.F.R. §35.136(i)(1)-(2).

*Id.* at 353. Those assessment factors considered: (i) The type, size, and weight of the miniature horse and whether facility can accommodate these features; (ii) Whether the handler has

sufficient control of the miniature horse; (iii) Whether the miniature horse is housebroken; and (iv) Whether the miniature horse's presence in a specific facility compromises legitimate safety requirements that are necessary for safe operation." *Id.* at 355. The court noted the parties had produced conflicting evidence as to those factors, and that the "determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." *Id.* (citing *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 844 (9th Cir. 2004)). The Sixth Circuit concluded that disputed issues of fact precluded summary judgment on the plaintiff's ADA claim for a reasonable modification to keep the horse and reversed the trial court's grant of summary judgment on that claim.

## IV.    The Summary Judgment Motions In This Case

Plaintiff's summary judgment motion asks this Court to rule, as a matter of law, that Defendants intentionally discriminated against E.F. in violation of Title II of the ADA and Section 504 by refusing to allow her to be accompanied in all areas of the school with her service dog Wonder. Plaintiff asks the Court to then hold a jury trial as to monetary damages only. Plaintiff's motion presents just one issue: "Did Defendants discriminate under Title II and the Rehabilitation Act by refusing to allow E.F., an otherwise qualified student with a disability, to be accompanied in all areas of a public elementary school with her trained service animal?" (ECF No. 80). Thus, Plaintiff's motion seeks summary judgment as to her intentional discrimination claim.

Again, Plaintiff's summary judgment motion does not assert that Plaintiff can show entitlement to summary judgment based on direct evidence. Rather, her motion proceeds under the *McDonnell Douglas* burden-shifting framework.

Plaintiff's brief notes that to establish a "prima facie case" of intentional discrimination under the ADA/Section 504, she must show that: 1) she has a disability; 2) she is otherwise qualified for participation in the program; and 3) she was subjected to discrimination under the program because of her disability. (Pl.'s Br., ECF No. 80, at 12). Plaintiff notes that the first two elements of a prima facie case are undisputed in this case.

As to the third element of a prima facie case, Plaintiff asserts that "a plaintiff may establish that an entity discriminated *because of* her disability by showing the entity could have reasonably accommodated the individual's disability, but refused to do so." (*Id*. at 12-13) (emphasis in original) (citing *McPherson, supra*). Plaintiff then states:

> Under Title II, a public entity discriminates against an individual with a disability when it fails to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making modifications would fundamentally alter the nature of the service, program or activity. *Anderson*, 798 F.3d at 353 (citing 42 U.S.C. §b12182(b)(2)(A)(ii); see also 28 C.F.R. § 41.53 (under § 504, an accommodation must not "impose an undue hardship on the operation of [an entity's] program").

(*Id.* at 13).

Rather than apply that general failure-to-accommodate standard to the facts here, the remainder of Plaintiff's brief is based upon a discussion of the Title III implementing regulation regarding service animals, which Plaintiff says required Defendants to allow Wonder to accompany E.F. to school, even though an equivalent regulation for Title II was not issued or effective until after the events at issue in this case.

Moreover, even if Plaintiff were to succeed in establishing a prima facie case, that is only the first step of the burden-shifting analysis that applies to an intentional discrimination claim

under the ADA.  As Plaintiff's Counsel acknowledged at the hearing, Plaintiff's brief does not address pretext at all.

It appears that Plaintiff has conflated the analysis of her intentional discrimination claim with a failure-to-accommodate claim.  That is, the motion starts out with an analysis of a "prima facie case" of an intentional discrimination claim, but it does not complete the analysis of that claim under the burden-shifting framework.  To do so, Plaintiff would need to present evidence to show that Defendants could have reasonably accommodated E.F.' disability, but refused to do so.  Assuming Plaintiff can do that, she would only establish a prima facie case of intentional discrimination.

Under the burden-shifting framework, once a plaintiff has established a prima facie case of discrimination, the analysis moves on to pretext.  "[T]he defendant 'must then offer a legitimate, nondiscriminatory reason for its' challenged action." *Id.*  "If [the defendant] does so – and its burden is merely one of production, not persuasion – [the plaintiff] must then present evidence allowing a jury to find that the [defendant's] explanation is a pretext for unlawful discrimination.'" *Anderson*, 798 F.3d at 357; *see also Tri-Cities Holdings*, 726 F. App'x at 308. Plaintiff's motion contains nothing as to this second step of the analysis of an intentional discrimination claim.

Rather, after addressing the elements of a prima facie case of intentional discrimination, Plaintiff' motion appears to shift into an analysis of an independent failure-to-accommodate claim.  And as to that claim, Plaintiff's motion is asking the Court to hold Defendants to the *Title III* implementing regulations that existed at the time of the events in this case.  Plaintiff's motion asserts:

Since July 26, 1991, the Department of Justice regulations implementing Title III of the ADA related to places of public accommodation have read:

> Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability.

28 C.F.R. § 36.302(c)(1). While no parallel regulation related to public entities was promulgated under Title II until the 2010 ADA Amendments became effective on March 15, 2011, federal courts repeatedly held even before the regulations were issued that "a public entity has the same legal obligation as a public accommodation to make reasonable modification to make reasonable modifications to policies or procedures to allow service animals access to facilities and places of public accommodation when necessary to avoid discrimination on the basis of disability."

(Pl.'s Br. at 14-15). In support of that assertion, Plaintiff directs the Court to a smattering of non-binding, mostly unpublished, cases. *Id.*

But even those cases do not support Plaintiff's request that this Court should simply hold Defendants to the Title III implementing regulations that existed in 2009 and 2010. For example, as to the above quote from *Pena*, the full paragraph of that decision reads as follows:

> Because Bexar County is a public entity, this case is governed by Title II. Title II and its regulations do not contain any provisions expressly concerning service animals, and Title III "expressly does not apply to public entities." *Bloom v. Bexar County, Tex.,* 130 F.3d 722, 726 (5th Cir. 1997). Thus, Title III's regulations and DOJ interpretations related to service animals do not directly govern in a Title II case. However, as noted by one court, "[w]hile the regulation specifically addressing service animals discusses a 'public accommodation' making the modification to allow access to a service animal, a public entity has the same legal obligation as a public accommodation to make reasonable modifications to policies or procedures to allow service animals access to facilities and places of public accommodation when necessary to avoid discrimination on the basis of disability. *See* 28 C.F.R. § 35.130(b)(7)." *Rose v. Springfield–Greene County Health Dept.,* 668 F.Supp.2d 1206, 1215 (W.D. Mo. 2009). Thus, even though the application of the Title III regulations and interpretations is unclear, Bexar County has an obligation to ensure that the Courthouse is "readily accessible" to qualified individuals with disabilities, and must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid

discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

*Pena,* 726 F.Supp.2d at 685. The district court in *Pena* declined to grant summary judgment noting, "the parties have not adequately briefed and argued the Title II claim, and the application of the law in this context is unclear, the Court finds that summary judgment must be denied on Count I." *Id*. at 688. Thus, *Pena* does not support Plaintiff's position that this Court should simply hold Defendants to the Title III implementing regulations and grant summary judgment in Plaintiff's favor.

Neither does *Rose v. Spingfield-Greene Cnty. Health Dept.*, 668 F.Supp.2d 1206 (W.D. Mo. 2009). In that district court case, the plaintiff had a monkey she claimed was a service animal. She brought suit asserting ADA claims against both private (under Title III) and public (under Title II) entities that denied her access with her monkey. The district court granted summary judgment to the defendants, concluding that the plaintiff's ADA claims failed because she is not disabled. The district court went on to conclude that, assuming *arguendo* that the plaintiff was disabled, her monkey would not qualify as a service animal under the Title III regulations regarding service animals. It included that as an alternative ground for granting summary judgment in favor of all of the defendants (both private and public). It appears that in order to finesse its consideration of the Title III regulations to all defendants, the district court included a footnote, that Plaintiff focuses on, stating "a public entity has the same legal obligation as a public accommodation to make reasonable modifications to policies or procedures to allow service animals access to facilities and places of public accommodation when necessary to avoid discrimination on the basis of disability." *Id*. at 1214 n.9. A district court noting that a

plaintiff could not succeed on her ADA claim even if the more stringent service animal

regulation applied to the public entity does not support what Plaintiff is trying to do here – apply

the more stringent regulation to a public entity before that regulation became effective.

The same is true of the footnote that Plaintiff directs the Court to in *Newberger v. La.

Dept. Of Wildlife & Fisheries*, 2012 WL 3579843 (E.D. La. 2012).  In that case, as in *Rose*, the

plaintiff brought an ADA claim against a public entity and claimed that her monkeys were

service animals.  The district court concluded the defendant was entitled to summary judgment

because her monkeys did not qualify as service animals under the Title III regulations.  In doing

so, it cited *Rose*.  Again, a district court finding that a plaintiff could not succeed on her ADA

claim even if the more stringent service animal regulation applied to the public entity does not

support what Plaintiff is trying to do here – apply the more stringent regulation to a public entity

before that regulation existed or became effective.

The Court also does not find *C.C. v. Cypress Sch. Dist*., 2011 U.S. Dist. LEXIS 88287

(D. Ca. June 13, 2011) helpful to Plaintiff on this issue. In that case, the plaintiff was a disabled

minor student who wanted to bring a claimed service dog to school with him.  Notably, in that

case the student obtained the dog in May 2010 and remained in the school, that would not let him

bring the dog to school, throughout the entire 2010-2011 school year.  The decision at issue was

a preliminary injunction order that was granted on *June 13, 2011*.  Thus, unlike this case, it

involved a claimed failure to allow the dog at a public school during a time period after the Title

II service animal regulations had issued and become effective.  Moreover, it appears that in

seeking summary judgment, the defendant did not assert that the service animal regulations did

not apply.  Rather, the defendant cited those regulations and claimed that the dog did not

constitute a service animal under them. The district court, however, found otherwise. This case does not support Plaintiff's position.

Defendants obviously disagree with Plaintiff's position and assert that, for several reasons, they cannot be held to the Title III implementing regulations as to service animals. Defendants note that "Plaintiff has failed to cite any binding authority that a title II entity can be bound by a uniquely title III regulation." (Defs.' Br. at 11). Defendants assert that, to the contrary, the Sixth Circuit has held that Title III, and its regulations, do not apply to public entities. *Sandison*, 64 F.3d at 1036.[6]

Defendants contend that the "generic" accommodation provision that applied to Title II ADA claims before the service animal regulations went into effect, should apply to Plaintiff's requested accommodation in this case. The parties agree that "generic" provision is set forth in 28 C.F.R. § 35.130(b)(7)(Defs.' Br., ECF No. 87, at 1) ("Title II did not have a service dog regulation. So, Title II's generic accommodation regulation, 28 C.F.R. § 35.130, applied to Plaintiff's request.")(Pl.'s Br., ECF No. 88, at 5).

The Court agrees that provision, which states as follows, appears to be the one that governs Plaintiff's ADA and Section 504 failure-to-accommodate claim in this case:

> (7)(I) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the

---

[6]Defendants also assert that if Plaintiff wants to proceed under those Title III regulations, then she should also be bound by the limitation that a plaintiff can only obtain injunctive relief under Title III (ie., money damages are not available) and no prospective injunctive relief could be issued here as E.F. no longer attends the school and no longer uses a service dog. (*See* Defs.' Resp. Br. at 11-12). That argument goes nowhere because Plaintiff cannot pursue a Title III claim against Defendants, public entities.

modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. 35.130(b)(7).

Defendants' summary judgment motion asserts that, if that standard applies, they are entitled to summary judgment as to Plaintiff's claims and make several arguments in that regard. The Court concludes that none of them, however, entitle Defendants to summary judgment.

Defendants assert that Plaintiff was only entitled to a "reasonable accommodation," not the "accommodation of her choice" and, therefore, the Court should enter summary judgment in their favor. In making this argument, Defendants assert that "EF was not entitled to the accommodation of her choosing but a 'reasonable accommodation' that allowed her access to the school and its programs." (Defs.' Br. at 10). Defendants maintain that, with the assistance of a human aide, E.F. had access to all of the school's programs during the 2009-2010 school year. They assert that because "EF was provided with accommodations that allowed her access to the schools and its programs," that "fully satisfies" Defendants obligations under the ADA and Section 504 and "should lead to the dismissal of this lawsuit." (Defs.' Br. at 6).

In support of their position, Defendants cite cases that do not involve analogous facts or claims. As Plaintiff notes, Defendants rely on Title I ADA employment cases and cases wherein the plaintiff was seeking relief for the denial of a FAPE under the IDEA. Plaintiff's brief explains why such cases do not govern in "a pure Title II or § 504 case." (*See* Pl.'s Br. at 16-18).

The Court rejects Defendants' argument. Defendants are not entitled to summary judgment on Plaintiff's failure-to-accommodate claim because E.F. had access to the school and its programs via a human aide provided to her by the school. A public school is bound by the

provisions of the ADA and does not have carte blanche to accommodate in any way it chooses when a covered individual has requested another accommodation. As persuasively explained in *Alboniga*:

> [R]efusing Plaintiff's requested accommodation if it is reasonable in favor of one the School Board prefers is akin to allowing a public entity to dictate the type of services a disabled person needs in contravention of that person's own decisions regarding his own life and care. As the *Sabal* court reasoned, it would be like refusing a blind person access for her service animal because, in the public entity's view, a cane works fine. That result would be would be absurd. The analysis, under Title II of the ADA . . .must focus only on whether the requested accommodation is reasonable under the specific circumstances particular to the individual in question. *See Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) ("Whether an accommodation is reasonable depends on specific circumstances"); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (holding in a Title II ADA case that whether a proposed accommodation is 'reasonable' is a question of fact.)

*Alboniga,* 87 F.Supp.3d at 1341.

To accept Defendants' position would be to ignore the mandate of the ADA that requires public entities provide a requested "reasonable accommodation" when doing so is not unduly burdensome.

Under the ADA, E.F. has the right to request to use a service dog as an accommodation for her disability, even if the school is already providing E.F. access to the school's facilities and programs through some other accommodation (in this case, the services of a human aide). Under the "generic" accommodation provision, that was in force during the time period at issue in this case:

> (7)(I) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. 35.130(b)(7). Thus, as to Plaintiff's failure-to-accommodate claim, the primary issue

to be determined is whether Plaintiff's proposed accommodation of having Wonder accompany

E.F. to school, with full access to the classroom and other areas, was a "reasonable

accommodation" which should have been implemented.

As various courts have recognized, the determination of what constitutes a reasonable

accommodation is highly fact-specific and requires a case-by-case inquiry. *See, e.g., Anderson,*

798 F.3d at 356 (Stating the "determination of what constitutes reasonable modification is highly

fact-specific, requiring case-by-case inquiry."); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485-86

(9th Cir. 1996). That fact-intensive issue cannot be determined as a matter of law on the record

that exists here. Defendants are not entitled to judgment as a matter of law on Plaintiff's failure-

to-accommodate claim. The claim shall proceed to a jury trial.

Defendants further assert that in order for Plaintiff to receive compensatory damages

under the ADA/Section 504, Plaintiff must show that Defendants intentionally discriminated

against Plaintiff or acted with deliberate indifference. In support of that assertion, Defendants

direct the Court to the following Sixth Circuit cases: 1) *R.K. ex rel. J.K. v. Board of Educ. of

Scott Cty.*, 637 F. App'x 933, 925 (6th Cir. 2016); and 2) *Hill v. Bradley Cty. Bd. of Educ.*, 295

F. App'x 740, 742 (6th Cir. 2008).

Plaintiff responds that she is not required to show deliberate indifference in order to

receive compensatory damages. Plaintiff notes that, in the above two cases, the parties agreed to

level of requisite intent and the Sixth Circuit expressly stated it was *not deciding* that issue. *Hill*,

295 F. App'x at 742 n.2 ("Because the parties agree on the law, we accept this interpretation

without deciding the level of requisite intent"; *R.K. ex rel. J.K.*, 637 F. App'x at 925 ("The

32

parties agree that, to obtain money damages under the ADA and the Rehabilitation Act, R.L,

must show that the school board acted with 'deliberate indifference' towards his federally-

protected rights" and "We assume without deciding that the parties are correct on this point.").

Plaintiff directs the Court to a district court case, from within the Sixth Circuit, wherein

the court analyzed this issue and concluded that a plaintiff need not prove deliberate indifference

to obtain compensatory or equitable relief under Title II of the ADA or Section 504. *I.L. v. Knox*

*Cnty. Bd. of Educ.*, 257 F.Supp.3d 946, 969 (E.D. Tenn. 2017).

Plaintiff also notes that she has a claim for declaratory relief under the ADA/Section 504

and that Defendants have not argued that declaratory relief cannot be granted absent a showing of

deliberate indifference.  (Pl.'s Br. at 22).

Plaintiff further asserts that even if she is required to make such a showing, she could do

so.  (Pl.'s Br. at 22-23).  Among other things, Plaintiff states:

> After the Frys asserted E.F.'s rights under Title II, Barnes determined the school's
> obligations not by consulting a legal expert, but rather, by running a Google
> search.  (ECF No. 80, Ex. 3, 32:9-33:13).  And, Richard Rendell, head of
> Defendant Jackson County ISD, threatened to defund E.F.'s human aides (a
> necessary accommodation) if E.F. were allowed to use her service animal in class.
> (*Id*. at App'x 20).  That is intentional discrimination beyond indifference.

(Pl.'s Br., ECF No. 85, at 24).  Plaintiff's brief also stresses that Defendants already had a policy

in place that allowed service dogs for visually impaired students, that permitted full access to

school premises, so long as the student provided the dog's certification and proof of liability

insurance.

The Court declines to grant summary judgment in Defendants' favor on this issue.

Plaintiffs' ADA/Section 504 claims that will proceed to trial include an intentional

discrimination claim.  Moreover, as to Plaintiff's failure-to-accommodate claim, the law on this issue is unclear in the Sixth Circuit and, in any event, construing the evidence in the light most favorable to Plaintiff, she may be able to make a showing of deliberate indifference at trial.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Plaintiff's Motion for Summary Judgment, and Defendants' Motion for Summary Judgment, are both DENIED and Plaintiff's claims shall proceed to a jury trial.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  September 25, 2019